STATE, Appellant, v. DEETZ and others, Respondents.

*No. 235.  Argued September 30, 1974.—Decided December 20, 1974.*
(Also reported in 224 N. W. 2d 407.)

For the appellant the cause was argued by *John E. Kofron,* assistant attorney general, with whom on the briefs was *Robert W. Warren,* attorney general.

For the respondents there was a joint brief for the respondents James E. Deetz, Patricia J. Deetz and Wild-

wood Bluffs Estates Association, Inc., by *Walter H. Erbach* and *Voss, Nesson & Koberstein, S. C.*, all of Madison, and for the respondent town of Dekorra by *Miller & Miller* of Portage; and oral argument for the respondents James E. Deetz, Patricia J. Deetz and Wildwood Bluffs Estates Association, Inc., by *Robert C. Voss*, and for the respondent town of Dekorra by *John O. Miller.*

HEFFERNAN, J. The principal question presented on this appeal is whether this jurisdiction should adhere to the "common enemy" doctrine in respect to surface waters, or abandon it in favor of the "reasonable use" doctrine, as numerous other jurisdictions have done. Other subsidiary issues are raised on this appeal.

This action was brought by the state of Wisconsin against James E. and Patricia J. Deetz, the Wildwood Bluffs Estates Association, Inc., and the town of Dekorra, for the purpose of enjoining those defendants from permitting the deposit of materials in Lake Wisconsin and on adjacent roads, and also asking for forfeitures under secs. 30.15 (1) and 30.15 (3), Stats.[1]

---

[1] Sec. 30.15, Stats., provides:

"Penalty for unlawful obstruction of navigable waters. (1) OBSTRUCTIONS PENALIZED. Any person who does any of the following shall forfeit not more than $50 for each offense:

"(a) Unlawfully obstructs any navigable waters and thereby impairs the free navigation thereof.

"(b) Unlawfully places in navigable waters or in any tributary thereof any substance that may float into and obstruct any such waters or impede their free navigation.

"(c) Constructs or maintains in navigable waters, or aids in the construction or maintenance therein, of any boom not authorized by law.

"(d) Constructs or places any structure or deposits any material in navigable waters in violation of s. 30.12 or 30.13.

"(2) EXCEPTIONS. Subsection (1) does not apply to the floating or movement of logs or timber in navigable waters, or the necessary use of temporary booms in the course of such floating or

The action arises because James and Patricia Deetz and other individuals purchased a large area of land on a bluff overlooking Lake Wisconsin, a portion of the Wisconsin river, and, on top of the bluff, platted and developed a residential area. This development project disturbed the topsoil and necessitated the construction of roads and drives. Prior to the development of this residential area, the bluff had been used for crops and for pasture land. Erosion and runoff was minimal until construction began. After that time, adjacent landowners, who held property below the bluff, noticed an unusual amount of sand washing down from the bluff. By October of 1972, as a result of this erosion, in one place a sand delta of over 6,000 square feet had formed in the lake. Prior to the commencement of this erosion, this portion of the lake was navigable; but at the time of trial, one of the adjacent landowners testified that, because of the silting, he was unable to launch a boat from a 32-foot pier extending out into the lake. Other substantial sand deltas formed along the lakeshore. One of the witnesses testified that another delta covered more than 8,000 square feet of the lake bottom.

There was substantial evidence that the adjacent landowners below the bluff and the public no longer could fish or boat in the immediate area, that swimming was precluded, and that vegetation had commenced to grow in the silted area. One of the roads at the bottom of the

movement or the cutting of weeds in such waters with the consent of the department.

"(3) EACH DAY A SEPARATE VIOLATION. Each day during which an obstruction exists in violation of sub. (1) is a separate offense.

"(4) OBSTRUCTIONS ARE PUBLIC NUISANCES. Every obstruction constructed or maintained in or over any navigable waters of this state in violation of this chapter and every violation of s. 30.12 or 30.13 is declared to be a public nuisance, and the construction thereof may be enjoined and the maintenance thereof may be abated by action at the suit of the state or any citizen thereof."

bluff on several occasions had been covered by sand, in some places to a depth of eight inches. The testimony left no doubt that the construction of the roads at the residential development site resulted in the flow of surface waters that carried away earth and sand from the top of the bluff to the lakeshore property below and to the lake. When the below-bluff property owners complained to Deetz, they were told there was nothing he could do about the problem.

The action was commenced by the state of Wisconsin. It brought the action under sec. 280.02, Stats., which provides that an injunction can be brought by the attorney general to abate a public nuisance.

As a separate cause of action, the state alleged that the defendants had violated sec. 30.15, Stats., *supra,* by unlawfully obstructing navigable waters. At trial it was urged that the defendants had also violated sec. 29.29 (3).[2]

---

[2] "29.29 (3) DELETERIOUS SUBSTANCES. No person may cast, deposit or throw overboard from any boat, vessel or other craft into any waters within the jurisdiction of the state, or deposit or leave upon the ice thereof until it melts, any fish offal; or throw or deposit, or permit to be thrown or deposited, into any waters within the jurisdiction of the state any lime, oil, tar, garbage, refuse, debris, tanbark, ship ballast, stone, sand, except where permitted by s. 30.12 (2) (b), slabs, decayed wood, sawdust, sawmill refuse, planing mill shavings or waste material of any kind, or any acids or chemicals or waste or refuse arising from the manufacture of any article of commerce, or any other substance deleterious to game or fish life other than authorized drainage and sewage from municipalities and industrial or other wastes discharged from mines or commercial or industrial or ore processing plants or operations, through treatment and disposal facilities installed and operated in accordance with plans submitted to and approved by the department of natural resources under ch. 144, or in compliance with orders of that department. Any such order shall be subject to modification by subsequent orders. Any person violating this subsection may be fined not

After submission of the plaintiff's case, the trial judge granted the motion to dismiss the complaint. The trial judge concluded that the statutes which prohibit the unlawful obstruction of navigable waters were irrelevant to this case, because the silt that blocked the roadways and filled in portions of the lake was not "deposited" by the defendants, but resulted from the flow of surface water from the development area. This, the trial judge concluded, was *damnum absque injuria,* because the damage had been done as a result of a legally sanctioned right of a property owner to fight surface waters, the "common enemy," in whatever way that might be appropriate. In the event that an adjacent landowner was damaged, there could be no recovery. The trial judge relied upon the accepted statement of Wisconsin law, as it appears in *Freeman v. Lake Mills* (1943), 243 Wis. 537, 539, 11 N. W. 2d 181. Therein, this court quoted from *Manteufel v. Wetzel* (1907), 133 Wis. 619, 114 N. W. 91:

". . . the one in position of upper proprietor caused surface water to flow in its natural direction so as to get it off his land, and although an annoyance to the adjacent owner, no resulting liability rested upon the upper proprietor for damages, nor was a nuisance created."

Accordingly, the motion of Deetz and the other defendants to dismiss the action was granted.

Although the defendants do not dispute that a public nuisance would have been created if the disposal of the surface waters constituted a tortious act, their argument is that they committed no wrong because they were acting within the rights of a landowner seeking to cope with surface waters.

less than $10 nor more than $200 or imprisoned not more than 30 days or both. Each day of a continuing violation is a separate offense."

The record makes clear that only the "common enemy" rule stands in the way of the state's efforts to secure an injunction against further damage to the shoreline and the water bed area of Lake Wisconsin.

The "common enemy" doctrine has been stated in its strict form by S. V. Kinyon and R. C. McClure, *Interferences with Surface Waters*, 24 Minnesota Law Rev. (1940), 891, 898:

"[A] possessor of land has an unlimited and unrestricted legal privilege to deal with the surface water on his land as he pleases, regardless of the harm which he may thereby cause to others."

Although the common enemy rule is sometimes thought to be of ancient origin, deriving from the English common law, the article by Kinyon and McClure convincingly demonstrates that there was no true common law of surface waters and that the law in that respect has been developed, both in the United States and in England, since 1850. Nevertheless, the common enemy doctrine has long been applied and followed in Wisconsin. *Shaw v. Ward* (1907), 131 Wis. 646, 654, 111 N. W. 671. In that case, this court quoted with approval the statement of the Massachusetts court in *Gannon v. Hargadon* (1865), 92 Mass. (10 Allen) 106, 109:

" 'The right of an owner of land to occupy and improve it in such manner and for such purposes as he may see fit, either by changing the surface or the erection of buildings or other structures thereon, is not restricted or modified by the fact that his own land is so situated with reference to that of adjoining owners that an alteration in the mode of its improvement or occupation in any portion of it will cause water, which may accumulate thereon by rains and snows falling on its surface or flowing onto it over the surface of adjacent lots, either to stand in unusual quantities on other adjacent lands, or pass into and over the same in greater quantities or in other directions than they were accustomed to flow.' "

In *Borchsenius v. Chicago, St. Paul, Minneapolis & Omaha R. Co.* (1897), 96 Wis. 448, 450, 71 N. W. 884, we said:

"Surface water is recognized as a common enemy, which each proprietor may fight off or control as he will or is able, either by retention, diversion, repulsion, or altered transmission; so that no cause of action arises for such interference, even if some injury occurs, causing damage."

The common enemy rule was given a complete application in the case of *Watters v. National Drive-In, Inc.* (1954), 266 Wis. 432, 63 N. W. 2d 708. In that case, the defendant constructed a drive-in theater adjacent to the plaintiffs' property. It changed the grade of the land, filled up natural potholes, and prevented, by grading and gravelling, the natural absorption of surface water into the soil. This resulted in a large amount of water being drained onto the plaintiffs' land, to the extent that it was necessary to reconstruct an existing roadway. Because of the deposit of water on the plaintiffs' land, some areas could not be used. Nevertheless, in its Draconian application of the common enemy rule, this court said, at page 436:

"[T]he plaintiffs have no cause of action for damages caused by drainage of surface waters, either because of the installation of tile drains or by changing the natural flow of such waters."

It is apparent that, under the common enemy rule, the trial judge in this case correctly concluded that the state had failed to prove a cause of action recognized by the law of Wisconsin—although there was an admitted injury, it was occasioned by the defendants' privileged activity, and accordingly no remedy would be afforded by the law.

On this appeal the state argues, incorrectly we conclude, that the common enemy rule is irrelevant. The

state argues that, under the "public trust" doctrine, a cause of action arises merely because the state is the trustee of stream beds or lake beds underlying navigable waters. It appears to argue that, under the "public trust" doctrine, any interference with the public's right to use the state's navigable waters, irrespective of the cause of such interference, is a nuisance and must be abated.

While the attorney general argues that the public trust doctrine per se creates a legal right, we conclude that that doctrine merely gives the state standing as trustee to vindicate any rights that are infringed upon by existing law.

The origin of the public trust doctrine has been given the most careful consideration in *Muench v. Public Service Comm.* (1952), 261 Wis. 492, 53 N. W. 2d 514, 55 N. W. 2d 40. Therein we said:

"[T]he state holds the beds underlying navigable waters in trust for all its citizens, subject only to the qualification that a riparian owner on the bank of a navigable stream has a qualified title in the stream bed to the center thereof." (P. 501)

The public trust doctrine has been used by citizens and by the state itself to limit or rescind actions taken by the state or the state agencies. For example, in *Muench* itself, it was held that the state could not delegate to county boards the power to approve the construction of dams on navigable waters because the delegation permitted:

"[T]he *'public right to the enjoyment of fishing, hunting, or natural scenic beauty'* in a navigable stream to be seriously impaired or destroyed through action of a county board and the Public Service Commission action is rendered powerless thereby to intervene to protect these public rights." *Muench*, page 515m.

On the other hand, as is illustrated by *Just v. Marinette County* (1972), 56 Wis. 2d 7, 201 N. W. 2d 761, this court,

relying on *Muench,* utilized the public trust doctrine to defend state action where that doctrine was used as the foundation for the state's legitimate concern in enacting a law for the purpose of preserving and protecting navigable waters and public rights therein from the degradation and deterioration which results from the uncontrolled use and development of shorelines.

The public trust doctrine, as it is utilized by various states which have adopted that or some similar theory, is thoroughly discussed by Joseph L. Sax, *The Public Trust Doctrine In Natural Resource Law: Effective Judicial Intervention,* 68 Michigan Law Rev. (1970), 471. He concludes that the public trust doctrine may be used as a tool for citizens for enforcement of the public's rights against government itself, as indeed it was used in *Muench* to challenge the state's delegation of its duty as a trustee. Sax writes:

". . . public trust law is not so much a substantive set of standards for dealing with the public domain as it is a technique by which courts may mend perceived imperfections in the legislative and administrative process." (P. 509)

Sax discusses numerous cases wherein the doctrine has been used by the courts to protect the public trust against state action. In one of his conclusions, he points out:

"The 'public trust' has no life of its own and no intrinsic content. It is no more—and no less—than a name courts give to their concerns about the insufficiencies of the democratic process." (P. 521)

In effect, the state has the usual powers of a trustee. A trustee, by virtue of such position, has standing to take legal action on behalf of the trust where some grievance recognized by the law gives rise to a cause of action. Its mere standing, however, does not create a cause of action.

The United States District Court for the District of Minnesota in the case of the *United States v. Reserve*

*Mining Co.* (1974), 394 Fed. Supp. 233, 242, considered the public trust doctrine of Wisconsin. It was claimed in that case, as in the instant one, that:

"[A]ny impairment of these waters creates not only standing to sue but an affirmative cause of action to prevent material impairment to the property, pursuant to the public trust doctrine."

The district court concluded that it would not interpret the Wisconsin public trust doctrine to provide per se an affirmative cause of action in addition to the traditional causes of action recognized by the state of Wisconsin. We believe that the district court properly stated the law of Wisconsin. The public trust doctrine merely establishes standing for the state, or any person suing in the name of the state for the purpose of vindicating the public trust, to assert a cause of action recognized by the existing law of Wisconsin.

In the instant case, therefore, the state of Wisconsin has undenied standing; but if the injury to the public trust occasioned by the excessive runoff of surface waters is governed by the common enemy rule, then no cause of action is stated.

The state argues that, in the event we find the common enemy rule bars the state's right to injunctive relief in the instant action, then that rule should be overruled because it has outlived its usefulness and no longer comports with the realities of modern society. It is only by overruling the common enemy doctrine that the state can prevail on count one of its complaint.

At the time Kinyon and McClure published the Minnesota Law Review article cited above, only two states, New Hampshire and Minnesota, had adopted the "reasonable use" rule, a rule that would limit the absolute right of the landowner to cause the diversion of surface water to an adjacent area to the damage of the owner of such adjacent property. Since that time, however, at least 11

more jurisdictions have adopted some form of the reasonable use rule either in preference to, or as adjuncts to, the civil law rule or the common enemy rule.[3]

The reasonable use test is well stated in *Armstrong v. Francis Corp.* (1956), 20 N. J. 320, 327, 120 Atl. 2d 4:

". . . each possessor is legally privileged to make a reasonable use of his land, even though the flow of surface waters is altered thereby and causes some harm to others, but incurs liability when his harmful interference with the flow of surface waters is unreasonable."

Kinyon and McClure list three justifications for the common enemy doctrine, none of which retains the vitality it had one hundred years ago.

"Some courts have justified this rule upon a narrow and one-sided conception of the nature of land ownership. Others have predicated their adoption of it upon the ground that it is consistent with the public policy favoring land improvement and development. Still others have adopted the rule because, in their opinion, it represents the English 'common law.' " (Pp. 898, 899)

Kinyon and McClure trace the origins of the rule and find that, prior to 1850, the rule in its present form was nonexistent. It is not a timeless rule of property. Rather, it is one that apparently served the temporary purposes of society well in the days of burgeoning national ex-

---

[3] *Weinberg v. Northern Alaska Development Corp.* (Alaska 1963), 384 Pac. 2d 450; *Rodrigues v. State* (1970), 52 Hawaii 156, 472 Pac. 2d 509; *Commonwealth, Dept. of Highways v. S & M Land Co., Inc.* (Ky. 1972), 503 S. W. 2d 495; *Armstrong v. Francis Corp.* (1956), 20 N. J. 320, 120 Atl. 2d 4; *Jones v. Boeing Co.* (N. D. 1967), 153 N. W. 2d 897; *Houston v. Renault, Inc.* (Tex. 1968), 431 S. W. 2d 322; and *Sanford v. University of Utah* (1971), 26 Utah 2d 285, 488 Pac. 2d 741; *Keys v. Romley* (1966), 64 Cal. 2d 396, 50 Cal. Rptr. 273, 412 Pac. 2d 529; *Baer v. Board of County Commissioners* (1969), 255 Md. 163, 257 Atl. 2d 201; *Wells v. State Highway Comm.* (Mo. 1973), 503 S. W. 2d 689; and *Morris v. McNicol* (1974), 83 Wash. 2d 491, 519 Pac. 2d 7.

pansion of the mid-nineteenth and early-twentieth centuries. The concept that a owner of real property can, in all cases, do as he pleases with his property is no longer in harmony with the realities of our society. We have long recognized that the police power—the power of government to implement its concern for the general welfare —may severely curtail the use to which real property may be put. In a context similar to the one before us, Mr. Chief Justice HALLOWS, speaking for the court in *Just v. Marinette, supra,* page 17, stated:

"An owner of land has no absolute and unlimited right to change the essential natural character of his land so as to use it for a purpose for which it was unsuited in its natural state and which injures the rights of others."

This expression of policy is contrary to the underlying rationale of the common enemy rule that a landowner has the unrestricted right to use his own property.

The second underpinning of the common enemy rule— that society has an interest in developing land for general welfare—remains of substantial importance. The New Jersey Supreme Court in *Armstrong, supra,* recognized that society has an interest in land development. It stated, although rejecting the common enemy rule:

"It is . . . properly a consideration in these cases whether the utility of the possessor's use of his land outweighs the gravity of the harm which results from his alteration of the flow of surface waters." (P. 330)

The yardstick to be applied is a rule of reason. Kinyon and McClure demonstrate that the common enemy rule has only been added to the common law in the last century. In any event, the common law is judge-made law, designed to accomplish the effectuation of recognized social policies within the framework of legal history. When a rule of law thwarts social policy rather than

promotes it, it is the obligation of a common-law court to undo or modify a rule that it has previously made.[4]

In light of the trend of the law to abandon the common enemy rule because it no longer comports with the realities of our society, the American Law Institute has attempted a codification of that rule in the Restatement, 4 *Torts*.[5] The Restatement rule provides:

"Non-trespassory invasions of a person's interest in the use and enjoyment of land resulting from another's interference with the flow of surface water are governed by the rules stated in secs. 822–831." Sec. 833, p. 269.

Under sec. 822[6] of Tentative Draft No. 17, which incorporates by reference the damages occasioned by surface waters, it is provided that one is subject to liability as a result of the nontrespassory invasion when:

"The invasion is either (a) intentional and unreasonable, or (b) unintentional and otherwise actionable under the principles controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities." (P. 22)

---

[4] "The common law system could not have survived through the centuries if it had been no more than a method of perpetuating its own past. It has survived and is healthy today because . . . it is a system that calls for growth, one that builds on the past to meet the needs of the present and the future. The system will not tolerate hogwild innovation, but without innovation, it will die—it would have died long ago." Robert A. Leflar, *Appellate Judicial Innovation*, 27 Oklahoma Law Rev. (1974), 321, 346.

[5] Restatement of the Law, Second, *Torts*, Tentative Draft No. 17, April 26, 1971, was presented to the American Law Institute in May, 1971. Restatement of the Law, Second, *Torts*, Tentative Draft No. 18, April 26, 1972, presented to the Institute in May, 1972, reported that the materials in Tentative Draft No. 17 had been approved in principle.

[6] Sec. 822 refers only to private nuisance. However, comment *a* to that section points out that the law of public nuisance is the same.

The reasonableness of an intentional act is a question of fact to be determined by weighing the factors set out in sec. 826, Tentative Draft No. 18, p. 3:

"Sec. 826. **Unreasonableness of invasion.**

"An intentional invasion of another's interest in the use and enjoyment of land is unreasonable under the rule stated in sec. 822, if

"(a) the gravity of the harm outweighs the utility of the actor's conduct, or

"(b) the harm caused by the conduct is substantial and the financial burden of compensating for this and other harms does not render infeasible the continuation of the conduct."

The factors involved in determining the gravity of harm are set out in sec. 827, Tentative Draft No. 17, page 36:

"Sec. 827. **Gravity of harm—factors involved.**

"In determining the gravity of the harm from an intentional invasion of another's interest in the use and enjoyment of land, the following factors are important:

"(a) the extent of the harm involved;

"(b) the character of the harm involved;

"(c) the social value which the law attaches to the type of use or enjoyment invaded;

"(d) the suitability of the particular use or enjoyment invaded to the character of the locality;

"(e) the burden on the person harmed of avoiding the harm."

The factors involved in determining the utility of conduct are set out in sec. 828, Tentative Draft No. 17, page 41:

"Sec. 828. **Utility of conduct—factors involved.**

"In determining the utility of conduct which causes an intentional invasion of another's interest in the use and enjoyment of land, the following factors are important:

"(a) the social value which the law attaches to the primary purpose of the conduct;

"(b) the suitability of the conduct to the character of the locality;

"(c) whether it is impracticable to prevent or avoid the invasion, if the activity is maintained;

"(d) whether it is impracticable to maintain the activity if it is required to bear the cost of compensating for the invasion."

Similar factors were considered in evaluating the reasonableness of conduct in *Swett v. Cutts* (1870), 50 N. H. 439, 446:

"In determining this question all the circumstances of the case would of course be considered; and among them the nature and importance of the improvements sought to be made, the extent of the interference with the water, and the amount of injury done to the other land owners as compared with the value of such improvements, and also whether such injury could or could not have been reasonably foreseen."

We conclude that the reasonable use doctrine as set forth in the Restatement of *Torts* better comports with the realities of modern society than does the common enemy doctrine and accords with the trend of decisions for the last thirty-five years.

Additionally, our conclusion is consistent, perhaps mandated, by our decision in *State v. Michels Pipeline Construction, Inc.* (1974), 63 Wis. 2d 278, 217 N. W. 2d 339, 219 N. W. 2d 308. As Kinyon and McClure, *supra,* point out, page 900, at the time the common enemy doctrine was devised by courts, it was consistent with the English rule with regard to subterranean percolating waters. That rule, adopted in Wisconsin and followed until *Michels Pipeline,* provided that subterranean percolating waters may be removed by the landowner without liability, irrespective of damage to adjacent lands. In *Michels* we overruled *Huber v. Merkel* (1903), 117 Wis. 355, 94 N. W. 354, and adopted the rule of Tentative Draft No. 17 of the Restatement of the Law, Second, *Torts,* sec. 858, page 156. That rule would permit a landowner to withdraw ground water, subject, however, to the restric-

tion that the withdrawal of the water not cause unreasonable harm by the lowering of the water table or the reduction of artesian pressure.

The rule which we adopt herein—the reasonable use rule—is consistent with the rationale employed in *Michels*. Accordingly, the defendants herein must be judged by the reasonable use rule. They will not be protected by the common enemy doctrine.

The conduct of Deetz and the land development enterprise was the cause in fact of the damage to the public trust. Only if it can be said from the record that the defendants acted reasonably will they be shielded from liability.

In light of our determination to abandon the common enemy rule, a question that remains is whether Deetz' conduct was reasonable under the Restatement standards. Inasmuch as the conduct of Deetz continued after the knowledge of the consequences of that conduct, the invasion was an intentional one under the provisions of sec. 822, *supra*. Liability will, however, be imposed only if such intentional conduct is unreasonable. The reasonableness of the conduct is to be tested by sec. 826, which provides in part:

"An intentional invasion of another's interest in the use and enjoyment of land is unreasonable under the rule stated in sec. 822, if
"(a) the gravity of the harm outweighs the utility of the actor's conduct."

Sec. 827 itemizes factors that may be used in the exercise of judicial discretion. The record, prima facie, reveals evidence showing:

"(a) the extent of the harm involved": Extensive deltas have been formed, the erosion is continuing; and, as the result of the erosion and the consequent silting, portions of the lakefront and the adjacent waters can no longer be used for swimming, fishing, and boating.

"(b)   the character of the harm involved": The physical damage to the lake, to the roadway, and to the below-bluff lands.

"(c)   the social value which the law attaches to the type of use or enjoyment invaded": Substantial. Portions of the lake dedicated to the public for recreational and navigational purposes, uses on which the state of Wisconsin places a high priority, have been impaired.

"(d)   the suitability of the particular use or enjoyment invaded to the character of the locality": The use for which Lake Wisconsin is most suitable, water recreation, has been impaired.

"(e)   the burden on the person harmed of avoiding the harm": The burden on the injured parties, the state of Wisconsin, as the trustee of the public trust, and on the private landowners to avoid the harm occasioned by the erosion is substantial.

We are satisfied that the gravity of the harm is prima facie proved by the evidence. That evidence, however, is but one side of the equation of reasonableness. The gravity of the harm is to be weighed against the utility of Deetz' conduct under the standards of sec. 828, Restatement, *supra*.

In view of the defendants' success in securing the dismissal of the complaint on legal grounds prior to putting in their own case, they foreclosed themselves in the original proceedings from any attempt to demonstrate that the social value of the conduct of Deetz outweighed the gravity of the harm to the injured parties.

Deetz' actions constitute conduct which has traditionally been recognized, and should continue to be recognized, as having a high social utility for the general welfare. The reasonable use rule retains one aspect of the philosophical underpinning of the common enemy rule, a policy of favoring land improvement and development. It is equally apparent, in view of the language of this court in *Just* and *Muench, supra,* that the economic social

utility of land development that impinges on the public trust is to be given far less value than tradition accorded it during the period of the industrial revolution. Nevertheless, the utility and the social value of Deetz' conduct must be appraised by the trial court before a determination can be made that such conduct was unreasonable and subject to injunction.

Accordingly, the cause must be remanded for further proceedings in order that the defendants may have the opportunity to submit evidence on social utility of their conduct. Only after such evidence has been presented can the trial judge determine whether the intentional invasion of the plaintiff's rights is unreasonable under the standards we adopt.

The state additionally argued that, by constructing roads and clearing the land on the top of the hill, causing the erosion of the bluff, which resulted in the formation of deltas in the lake, Deetz deposited sand and other materials in violation of sec. 29.29 (3), Stats., and sec. 30.12 (1) (a). It argued that, because Deetz violated these criminal provisions in a continued course of conduct, that such conduct constitutes a public nuisance under *State v. H. Samuels Co.* (1973), 60 Wis. 2d 631, 637, 211 N. W. 2d 417. In that case we said, ". . . this court is now committed to the proposition that the repeated violation of criminal statutes constitutes per se a public nuisance." While that is a correct statement of the law, the trial judge properly concluded that these statutes contemplate a deliberate act of depositing sand or other materials in the waters. We agree with that conclusion and hold that Deetz violated neither of these statutes.

The legislative history of sec. 30.12, Stats., was analyzed in *Hixon v. Public Service Comm.* (1966), 32 Wis. 2d 608, 146 N. W. 2d 577. That case pointed out that sec. 30.12 was a codification of the common-law rule relied upon in *Diedrich v. Northwestern Union R. Co.* (1877), 42 Wis. 248. *Diedrich* discussed and approved

the right to construct piers and wharves in aid of navigation but held that a riparian owner could not, without an express grant of authority, "intrude within the natural shore of the water." (P. 263) It is evident that the prohibited acts contemplated in *Diedrich* were intentional acts; and, since sec. 30.12 merely restates the common law, it does not apply to the conduct which only indirectly and unintentionally resulted in deposits on the lake bottom. The provisions of sec. 30.12 show that, to be prohibited, there must be a consciousness of depositing material in a navigable water. The type of conduct here is not prohibited by sec. 30.12 or sec. 30.15. Sec. 30.02 (1) (b), Laws of 1933, ch. 455, sec. 2, now renumbered as sec. 30.12 (1) (a), was drafted by Adolph Kanneberg and discussed by him in *Wisconsin Law of Waters,* 1946 Wisconsin Law Rev. 345, 379. Attorney Kanneberg, who is recognized by this court in *Muench, supra,* page 500, as an authority on water law, in discussing sec. 30.02, makes clear that the statute was designed to prohibit only deliberate fills.

The attorney general, in discussing the statute, stated in 41 Op. Atty. Gen. (1952), 107, 110, that, "This statute contemplates the deliberate act of placing fill or some structure on the bottom of a lake or stream . . . ."

Sec. 30.12 (1) (a), Stats., is not relevant to the conduct of Deetz in the instant case.

Reliance is also placed upon sec. 29.29 (3), Stats. Sec. 29.29 (3) appears in the context and under the general title of "Fish and Game" and originally was enacted by the Laws of 1917, ch. 668, sec. 3, which was concerned with "Wild Animals, and the Regulation of the Enjoyment, Disposition and Conservation Thereof; General Control and Regulation." Sec. 29.29 is concerned with "Noxious substances"; sec. 29.29 (1) with "explosives and stupefactives"; sec. 29.29 (2) with "poison bait"; and sec. 29.29 (3), upon which the state relies, with "deleterious substances."

While the state is correct in concluding that this statute no longer requires wilfulness in the deposit of deleterious substances into water and that the negligent deposit may bring a violator's conduct within the proscriptions of this statute, the statute, cited *supra,* footnote 2, is concerned with the discharge into navigable waters and the control of refuse arising from manufacturing activities. Although such unintentional discharges are prohibited, there is no reference to silting caused by the discharge of surface waters from natural causes not contaminated with sewage. The statute does not attempt to control or prohibit silting caused by surface water runoff.

The prohibited types of contamination that are denominated as deleterious substances are itemized with considerable particularity. Nothing in the statute or its context indicates that, at the time of its passage, the legislature was concerned with the discharge of surface waters into a navigable stream.

The trial judge correctly stated that erosion control should be exercised by zoning and subdivision and land use regulations. An article by Jon A. Kusler, *Water Quality Protection for Inland Lands in Wisconsin: A Comprehensive Approach to Water Pollution,* 1970 Wisconsin Law Rev. 35, discusses the use of state and local flood plain and shoreline zoning ordinances to cope with controlling indirect pollution caused by erosion arising from road construction and residential developments.

Sec. 144.26, Stats., establishes a mechanism for promulgation of standards to be used by the state and municipal agencies to protect the waters of the state from indirect pollution. In this case, however, the state does not argue that any specific regulations adopted under ch. 144 are at issue, nor do we see any basis for using the general purposes set forth in ch. 144 to interpret either sec. 29.29 (3) or sec. 30.12. The legislative scheme of ch. 144 is to implement its purposes by ordinances and regulations enacted pursuant thereto and not by extending

the scope of criminal statutes that were not intended to cover indirect pollution.

The town of Dekorra is also a defendant, and it argues on this appeal that there was no evidence presented at the trial that showed that any conduct on its part caused any of the erosion. The parties at oral argument conceded that the town's contention in this respect was correct and stipulated to its dismissal from this lawsuit.

Accordingly, the cause of action against the town is dismissed. Even in the absence of stipulation, the trial judge correctly concluded that there was no evidence that the town caused the deposit of silt in Lake Wisconsin.

We conclude that the reasonable use rule, which we adopt herein, shall be prospective only and that conduct prior to the mandate of this case is immunized by the common enemy rule. While we adopt the reasonable use rule and make it applicable to the litigants herein, in respect to all others it is prospective only.

*By the Court.*—The order dismissing the complaint against the town of Dekorra is affirmed; the order dismissing the complaint against James E. and Patricia J. Deetz and Wildwood Bluffs Estates Association, Inc., is vacated, and the cause is remanded for further proceedings not inconsistent with this opinion.