SOO LINE RAILROAD COMPANY, Petitioner-Appellant,†

v.

OFFICE OF the COMMISSIONER OF TRANSPORTATION,
Respondent-Respondent.

Court of Appeals

*No. 91–2895. Submitted on briefs May 8, 1992.—Decided*
*August 13, 1992.*

(Also reported in 489 N.W.2d 672.)

† Petition to review denied.

544

For the petitioner-appellant the cause was submitted on the brief of *Patrick J. Nugent* of *Soo Line Railroad Company* of Minneapolis, Minnesota.

For the respondent-respondent the cause was submitted on the brief of *James E. Doyle,* attorney general, with *Mary Woolsey Schlaefer,* assistant attorney general.

Before Eich, C.J., Gartzke, P.J., and Dykman, J.

GARTZKE, P.J. Appellant Soo Line (railroad) appeals from an order of the circuit court. On ch. 227, Stats., review, the circuit court affirmed an order of the Office of the Commissioner of Transportation, requiring the railroad to install a 60-inch pipe in its track embankment in order to alleviate upstream flooding. We affirm.

## 1. Background

In 1969, Russell Knuth purchased and moved into a home located south of and adjacent to a Soo Line railroad embankment. The embankment carries the main-line eastbound track. A stream runs south to north through the Knuth property. The Knuth property is upstream, relative to the east-track embankment. A similar embankment on the downstream side carries the westbound track. His property is drained through three different pipes running through the east-track embankment: a 42" concrete pipe installed in 1889, a 42" metal pipe installed in 1972 as part of routine maintenance, and a 60" metal pipe installed in 1973, specifically to

alleviate flooding on the property. After running through the east-track embankment, the water runs for several hundred feet between the east- and west-track embankments, and exits through drainage provisions in the west-track embankment.

From 1973 until 1987, the east-track pipes sufficed to drain Knuth's property. Since 1987, his property has suffered flooding on at least five occasions. The stream becomes swollen, and on occasion, much of his property is flooded up to a depth of six feet. During one storm, firefighters had to rescue the Knuth family from flooding. The existing pipes will drain the floodwaters away in three to four hours, but damage, debris and erosion result from the floods.

Relying on the provisions of sec. 88.87, Stats.,[1] Knuth requested the Office of the Commissioner of

---

[1]Section 88.87, Stats., reads in part:

(1)  It is recognized that the construction of highways and railroad grades must inevitably result in some interruption of and changes in the preexisting natural flow of surface waters and *that changes in the direction or volume of flow of surface waters are frequently caused by the erection of buildings, dikes and other facilities on privately owned lands adjacent to highways and railroad grades.* The legislature finds that it is necessary to control and regulate the construction and drainage of all highways and railroad grades so as to protect property owners from damage to lands caused by unreasonable diversion or retention of surface waters due to a highway or railroad grade construction and to impose correlative duties upon owners and users of land for the purpose of protecting highways and railroad grades from flooding or water damage.

(2)(a)  Whenever any county, town, city, village, *railroad company* or the department of transportation *has heretofore constructed and now maintains* or hereafter constructs and maintains *any highway or railroad grade in or across any marsh, lowland, natural depression, natural watercourse, natural or man-made channel or drainage course, it shall not impede the general flow of surface water or stream water in any unreasonable manner so as to cause either an unnecessary accumulation of waters flooding or water-soaking*

---

Transportation (OTC) to order Soo Line to install an additional 60" drainage pipe to alleviate the backed-up floodwaters.

The OTC conducted a hearing at which it found that the increase in water volume during floods occurred because the City of Brookfield had allowed extensive development in the catchment area for and upstream from the railroad's drainage pipes. The City neglected to

> *uplands* or an unreasonable accumulation and discharge of surface waters flooding or water-soaking lowlands. All such highways and railroad grades shall be constructed with adequate ditches, culverts, and other facilities as may be feasible, consonant with sound engineering practices, to the end of maintaining as far as practicable the original flow lines of drainage.
>
> . . ..
>
> (c) Whenever any county, town, city, village, railroad company or the department of transportation constructs and maintains a highway or railroad grade not in accordance with par. (a), any property owner damaged thereby may, within 90 days after the alleged damage occurred, file a claim with the appropriate governmental agency or railroad company. Such claim shall consist of a sworn statement of the alleged faulty construction and a legal description of the lands alleged to have been damaged by flooding or water-soaking. Within 90 days after the filing of such claim, the governmental agency or railroad company shall either correct the cause of the water damage, acquire rights to use the land for drainage or overflow purposes, or deny the claim. If the agency or company denies the claim or fails to take any action within 90 days after the filing of the claim, the property owner may bring an action in inverse condemnation under ch. 32 or sue for such other relief, other than damages, as may be just and equitable.
>
> . . ..
>
> (4) If a railway company fails to comply with sub. (2), any person aggrieved thereby may file a complaint with the office of the commissioner of transportation setting forth the facts. The office shall investigate and determine the matter in controversy in accordance with ch. 195, and any order it makes in such proceeding has the same effect as an order in any other proceeding properly brought under ch. 195.

(Emphasis supplied.)

require storm sewers or other provisions to remedy the increased run-off. Despite its finding that the railroad was not responsible for the increased flow, in reliance on sec. 88.87, Stats., OTC ordered the railroad to install the additional drainage pipe. The railroad brought an action for ch. 227, Stats., review in the circuit court, that court affirmed, and the railroad appeals.

## 2. Standard of Review

In a ch. 227, Stats., appeal, we review the agency's decision, not the trial court's. *Keeler v. LIRC,* 154 Wis. 2d 626, 632, 453 N.W.2d 902, 904 (Ct. App. 1990). We defer to the agency's fact-finding. Section 227.57, Stats. Generally, three levels of deference are granted to an agency's conclusions of law and statutory interpretations. *Sauk County v. WERC,* 165 Wis. 2d 406, 413, 477 N.W.2d 267, 270 (1991). First, if the agency's experience, technical competence and specialized knowledge aid the agency in its interpretation and application of the statute, the agency's determination is entitled to "great weight." *Id.* Second, if the agency's decision is "very nearly" one of first impression, we grant it "due weight." *Id.* at 413–14, 477 N.W.2d at 270. Third, we review the agency's conclusions and interpretations *de novo,* according them no weight if the case is one of first impression for the agency and it lacks special expertise or experience in determining the question presented. *Id.* at 414, 477 N.W.2d at 270–71.

## 3. Analysis

Even employing the most stringent *de novo* standard, *Sauk County,* 165 Wis. 2d at 414, 477 N.W.2d at

549

270–71, we are satisfied that under the terms of the statute itself and of the case law, OTC's order is correct.

### a.   The statute

The railroad argues that because the increased flow across Knuth's land is the result of the upstream development, OTC erred in interpreting sec. 88.87, Stats., to require the railroad to correct the problem.[2] OTC argues that the statute unambiguously places the responsibility on the railroad and that predecessor statutes were judicially interpreted to that effect.

On its face, sec. 88.87(1), Stats., imposes responsibility on the railroad to accommodate changes in drainage stemming from "erection of buildings . . . on privately owned lands adjacent to . . . railroad grades." If the railroad constructed and "now maintains . . . any . . . railroad grade . . . across any . . . natural or man-made channel or drainage course," it must "not impede the general flow of surface water or stream water in any unreasonable manner so as to cause . . . an unnecessary accumulation of waters flooding or water-soaking uplands . . .." Section 88.87(2)(a), Stats.

### b.   Wisconsin precedent

Although the statute on its face requires the railroad to respond to drainage alterations, the railroad asserts it

---

[2]The railroad appears to be advancing an argument that because the statute was interpreted in a manner inequitable to it, the commission must have erred. We note that the railroad is not contesting the statute itself. Therefore, we must take the statute as our starting point. If the statute results in inequity to the railroad, the railroad must seek relief in the legislature, or in a constitutional challenge.

550

cannot be interpreted to require the railroad to install a new culvert under the facts of this case. Specifically, the railroad argues that the terms "unnecessary" and "unreasonable" in sec. 88.87(2)(a), Stats., require the agency to exercise its discretion to find that no "unreasonable" impoundment of water here exists. To support its argument, the railroad relies upon Wisconsin case law. It argues that under the precedents, railroads have not had to provide drainage in certain circumstances, which, the railroad implies, resemble the situation here.

The parties correctly note sec. 88.87, Stats., has never been interpreted in published precedent. However, similar and predecessor statutes[3] have been interpreted. In *Lemonweir River Drainage Dist. v. Chicago, Milwaukee, St. Paul & Pacific R.R.*, 199 Wis. 46, 49–50, 225 N.W. 132, 133 (1929), the court held that sec. 89.65, Stats. (1929),[4] was

> but a declaration of the common-law rule that a railroad company crossing with its roadbed a natural watercourse is bound to construct its roadbed so as not to materially interfere with the natural flow of such watercourse; and further, that such duty is not a

[3]The direct predecessors of current sec. 88.87, Stats., are the pre-1963 versions of secs. 88.38 and 88.40, Stats. See secs. 1 and 2, ch. 572, Laws of 1963, which repeal all of former ch. 88 and 89, Stats., and recreate ch. 88 into essentially its current form. Because former ch. 89 was subsumed into ch. 88, pre-1963 precedents under ch. 89 are relevant to interpreting ch. 88 also.

[4]Section 89.65(1), Stats. (1929), provides in relevant part:

> Whenever any embankment, grade, culvert or bridge . . . built or maintained by any . . . corporation across any natural watercourse or natural draw so obstructs such watercourse or draw that waters therein are set back or diverted upon lands in any district, such . . . corporation shall so enlarge the waterway through such embankment, grade, culvert or bridge . . . that it will not set back or divert such waters upon lands in such district.

once-and-for-all duty and forever discharged by a proper original construction over such stream, but is a continuing one, and such railroad must adjust such construction thereafter and, in the absence of [a] statute to the contrary, at its own expense, to meet changes in the condition of such watercourse arising, either from natural causes, or by reason of any lawful enlargement of the flow in the same because of constructions [thereafter] . . ..

*Lemonweir* thus imposes the responsibility on the railroad to accommodate changing conditions.

The railroad distinguishes *Lemonweir* because the increased flow in *Lemonweir* arose "lawfully," and the increased flow across Knuth's land was "unlawful," since OTC found the city failed its statutory duty to provide for storm sewers, and that failure caused the increased flow. We conclude, however, that the lawfulness or unlawfulness of the flow is irrelevant to the issue whether the railroad has an ongoing duty to provide drainage. The lawfulness of the cause of the increased flow relates to whether the railroad has a claim for reimbursement from the person causing the increase. Section 88.87(3), Stats.,[5] requires upstream landowners to pro-

---

[5]Section 88.87(3), Stats., reads in part:

(a)   It is the duty of every owner or user of land who constructs any building, structure or dike or otherwise obstructs the flow of stream water through any watercourse or natural or man-made channel or obstructs the flow of surface water through any natural or man-made channel, natural depression or natural draw through which surface waters naturally flow:

1.   To provide and at all times maintain a sufficient drainage system to protect a downstream highway or railroad grade from water damage or flooding caused by such obstruction, by directing the flow of surface waters into existing highway or railroad drainage systems . . ..

. . ..

tect downstream railroad embankments and imposes liability on the upstream landowner if the upstream landowner fails to comply with that duty.

The railroad cites the companion cases of *Laur v. City of Milwaukee*, 1 Wis. 2d 561, 85 N.W.2d 349 (1957) (*Laur I*) and *Laur v. Chicago and North Western Ry.*, 1 Wis. 2d 567, 85 N.W.2d 353 (1957) (*Laur II*), as well as *Chicago, Burlington & Quincy R.R. v. Railroad Comm'n*, 199 Wis. 342, 226 N.W. 286 (1929), for the proposition that the railroad has no obligation to construct substitute drainage facilities where upstream landowners have caused flooding by impeding or diverting water. We conclude that these cases are inapplicable.

As the railroad acknowledges, the three cases arose under the now rejected "common enemy" doctrine, which allowed a landowner to make whatever changes to his or her land as were necessary to repel the common enemy of water. No cause of action resulted to other landowners damaged by the change. *Laur I*, 1 Wis. 2d at 564, 85 N.W.2d at 351. Wisconsin has moved to the "reasonable use" doctrine, *State v. Deetz*, 66 Wis. 2d 1, 19, 224 N.W.2d 407, 416 (1974), under which the court must compare the benefits and detriments of development to determine whether the effect on water flow is acceptable. The result of that comparison may be to vest a landowner who is damaged by the change with a claim against the person who caused the change.

---

(b)   *Whoever fails or neglects to comply with a duty imposed by par. (a) is liable for all damages to the highway or railroad grade caused by such failure or neglect. The authority in charge of maintenance of the highway or the railroad company which constructed or maintains the railroad grade may bring an action to recover such damages.* An action under this paragraph shall be commenced within the time provided by s. 893.59 or be barred.

(Emphasis supplied.)

Analysis of the three cases relied upon by the railroad show that they support a result contrary to that advocated by the railroad. In the two *Laur* cases, the railroad's culvert allowed water to drain from A's land onto B's. B then raised the level of her land, reversing the water flow and causing it to run through the culvert onto A's land. A brought an action against the railroad on the theory that a predecessor statute to sec. 88.87, Stats., required the railroad to provide as good a drainage as when the drainage was from A's land to B's. The court dismissed each action on grounds that the embankment itself had not impeded the water. The court's evident rationale in finding the railroad not liable to A was that the railroad culvert was not a source of the flooding. *Laur II*, 1 Wis. 2d at 571–72, 85 N.W.2d at 355–56. Stated otherwise, were the railroad embankment removed from the face of the earth, the drainage situation would remain the same, and the court therefore concluded that changes to the railroad embankment were not warranted.

The *Chicago, Burlington & Quincy* court held that the source of the flooding was two-fold: A highway embankment blocked the stream across appellant's land, and the railroad embankment also blocked the stream.[6] The court noted that "the proposed change in the railroad embankment would be entirely futile without [a similar] change in the highway [embankment]." *Id.* at 345, 226 N.W.2d at 287. The court, however, noted that the Railroad Commission had no authority to compel the required change in the highway. Therefore, the court held that the railroad need not make the drainage

---

[6]*See also* Cases and Briefs in the Wisconsin Supreme Court, vol. 1695 (199 Wis. 334–378). The fold-out map exhibit following page 120 of the appellant's appendix shows the highway embankment as an additional obstacle to the original drainage pattern.

changes. As in *Laur II,* the court's rationale again depended on a finding that the railroad embankment was not the source of the flooding: removing the railroad embankment would not change the drainage situation.

Here by contrast, if the embankment were not in place, the increased waters would not back up onto Knuth's land but would flow over his land unimpeded and go downstream. Unlike the embankments in *Laur* and *Chicago, Burlington & Quincy,* the embankment in this case is a cause of the flooding. Unlike the facts in those cases, in this case a change in the culverts running through the embankment could solve the problem. Therefore, the main cases relied upon by the railroad do not stand for the proposition that under the facts before us, the railroad need not alter its embankment by installing a new culvert.

Under *Lemonweir,* the railroad has an ongoing duty to accommodate increased floodwaters impeded by its embankment. *Laur* and *Chicago, Burlington & Quincy* are not to the contrary, because they deal with situations where the change sought in the railway embankment would not affect the flooding. We therefore conclude that the precedent supports our reading of the statute: the railroad "shall not impede the general flow" of water, sec. 88.87(2)(a), Stats., and the duty not to impede is "ongoing," *Lemonweir,* where the railroad now "maintains" any grade across any drainage course, sec. 88.87(2)(a), even if the increased flow arises from "changes in . . . volume . . . caused by the erection of buildings, dikes and other facilities on privately owned lands." Section 88.87(1), Stats.

### c. Matters not raised previously

The railroad contends that under the "reasonable use" doctrine, established in *State v. Deetz*, 66 Wis. 2d 1, 224 N.W.2d 407 (1974), it has no obligation to improve the existing drainage and therefore protect itself and the downstream landowners from the bad effects of having to build a culvert. However, OTC asserts, and the railroad does not deny, that in the agency proceedings, no proof of harm to the railroad or the downstream owners was offered. The railroad also argues damage to downstream landowners requires that they be notified of the hearings, but that issue was not raised before OTC. We will not consider issues raised for the first time on appeal. *Zeller v. Northrup King Co.*, 125 Wis. 2d 31, 35, 370 N.W.2d 809, 812 (Ct. App. 1985); *Cappon v. O'Day*, 165 Wis. 486, 490–91, 162 N.W. 655, 657 (1917).

### 4. Requirement for a study

The railroad argues that it should not be required to provide the drainage without the benefit of a study addressing the drainage problem. It appears from the record that the city intends to conduct such a study within the next few years, but it is unclear whether the railroad wishes to wait for the results of that study or believes that OTC must conduct its own study.

Section 88.87, Stats., does not require a study to be undertaken before the railroad can be ordered to install a drainage pipe.[7] No cross-reference is made to the other

---

[7]Section 88.87, Stats., refers to the procedures set forth in ch. 195, Stats. Section 195.04, Stats., provides that the agency "may" investigate a complaint. "Investigation" and "study" are not the same, and it is undisputed that the agency has conducted a local

drainage statutes identified by the railroad. While a study may be an excellent idea, and while comprehensive drainage planning is to be encouraged, the statute does not provide for it. It was not error for OTC to order the drainage without the benefits of the city's study without a study of its own.

### 5. Specificity of the order

The railroad's last argument is that OTC's order is insufficient under the terms of ch. 195, Stats., cross-referenced by sec. 88.87(4), Stats. Specifically, the railroad argues that under ch. 195, OTC is required to lay out the exact requirements of the pipe to be installed and specify where it shall be installed. OTC counters that its order is sufficiently specific.

We will not enter that debate. The railroad requested that if an additional pipe was ordered, OTC should allow the railroad to decide how exactly to meet the requirements for an additional pipe. Having invited the error (if error it is) the railroad cannot complain that it occurred. *Zindell v. Central Mut. Ins. Co.*, 222 Wis. 575, 582, 269 N.W. 327, 330 (1936).

*By the Court.*—Order affirmed.

investigation into the flooding. We reject the railroad's implied invitation to parlay permission to investigate into a requirement that a study be conducted.