TIEDEMAN and others, Appellants, v. VILLAGE OF MIDDLE-TON, Respondent.

*October 2—October 27, 1964.*

444

446

For the appellants there were briefs by *Aberg, Bell, Blake & Metzner* of Madison, and oral argument by *Robert K. Aberg*.

For the respondent there was a brief by *Warren D. Lucas*, attorney, and *Harold E. Hanson* of counsel, both of Madison, and oral argument by *Mr. Lucas*.

WILKIE, J.  Three issues are presented on this appeal:

1. Does the city of Middleton have the right to discharge surface water from the drainage area onto appellants' land?

2. Did appellants acquire a prescriptive right to the diversion of the surface water by the railroad embankment?

3. Are appellants entitled to injunctive relief in this situation?

*First: Does the city of Middleton have the right to discharge surface water from the drainage area onto appellants' land?* There are two possible theories under which the city

could drain water on appellants' land: (1) Allowing the water to continue the direction of its natural flow, and (2) the power of a municipality to divert water incidental to construction of sewers or streets.

(1) Direction of Natural Flow.

Municipal corporations have the same rights in regard to surface waters as have individuals.[1] A municipality may, therefore, channel surface water in its natural direction via conduits rather than over the surface or by percolation if no new watershed is tapped and the volume of water is not increased.[2]

The trial court found that with a minor exception, all the surface water from the whole drainage area (58 acres) would have drained naturally into the pond were it not for the railroad embankment. The exception was a half-acre tract lying north of the tracks between Park and Maple streets. The court found that this small area would not have drained into the pond had it not been for the Middleton storm-sewer system, but that the amount of water it contributed to the pond was negligible. Appellants assail these findings as being contrary to the evidence.

The trial court's findings of fact will not be disturbed unless they are against the great weight and clear preponderance of the evidence.[3] If upon consideration of all the evidence, this court could reasonably arrive at the same conclusion, the finding below will not be upset. Appellants contend, and it is undisputed, that there are several depressions within the drainage area in which surface waters ac-

[1] *Bratonja v. Milwaukee* (1958), 3 Wis. (2d) 120, 87 N. W. (2d) 775; *Freeman v. Lake Mills* (1943), 243 Wis. 537, 11 N. W. (2d) 181; *Hoyt v. Hudson* (1871), 27 Wis. 656.

[2] *Freeman, supra,* footnote 1; *Manteufel v. Wetzel* (1907), 133 Wis. 619, 114 N. W. 91.

[3] *Clark v. Moru* (1963), 19 Wis. (2d) 503, 120 N. W. (2d) 888; *State ex rel. Isham v. Mullally* (1961), 15 Wis. (2d) 249, 112 N. W. (2d) 701.

cumulate. All the water, then, does not ultimately end up in the pond. However, this literal construction of the finding flies in the face of common sense. The trial court certainly was aware that not only does water evaporate into the air and percolate into the ground, but that it ponds in low spots. The sum and substance of the finding is that all of the water in the drainage area which does drain, would find its way naturally to the pond if it were not for the railroad embankment. The finding cannot be disturbed because there were a few ponding areas.

Appellants argue that the record is void of evidence proving that water from the drainage area would have reached the pond prior to the time the railroad embankment was laid. It is not surprising that neither side could produce a witness with firsthand knowledge of the water flow one hundred years ago. Witnesses on both sides testified in essence that water in any part of the drainage area, with the one exception, would flow southerly toward the pond. Appellants' expert, Meklin, presented corroborating evidence in the form of land elevation readings. The elevation of the pond hovered around 910. The elevation of the swale, which lies between the tracks and the pond is 924.20. The elevations of various streets and corners within the drainage area are greater than those of the pond and the swale by the indicated amounts, respectively: Middleton and Hubbard (20 and 6 feet), Hubbard and Park (30 and 16 feet), Henry and South (21 and 8 feet), Park and South (25 and 11 feet), Mayflower and South (32 and 18 feet), Maple and South (30 and 16 feet), Elmwood (32 and 18 feet), Hubbard (28 and 14 feet), and South (20 and 6 feet). Would appellants have this court overrule the law of gravity and decide that water does not run down hill? It is true that these are 1960 readings. But due to the significant differences in elevation, the trial court could have reasonably relied

on the readings in conjunction with the testimony to conclude that had the tracks not been there, the water would have flowed to the pond. The finding is not against the great weight and clear preponderance of the evidence.

Appellants also contend that a new watershed—the Anderson and Meadows developments—was tapped by the drainage system. The testimony and the elevation readings indicate that except for the small area, which was correctly determined to be of no import, the water from these developments always would have drained into the pond had it not been for the embankment.

Furthermore, the volume of water routed to appellants' land by the drainage system was not increased. The best evidence of this are the readings showing that the level of the pond did not rise significantly after the installation of the new culvert system. The elevation of the pond on August 22, 1960, was 909.66. After a 3.74-inch rainfall on September 18th, a 910.57 reading was taken. Readings on November 17th, January 17, 1961, and June 27, 1963, were 910.35, 910.08, and 908.96, respectively. The last water level reading was actually lower and the intervening levels not appreciably higher, than the first reading. Appellant Lemcke testified that the pond overflowed Park street about 40 years ago. The elevation of Park street, without the present grading, is nearly two and a half feet higher than the pond. Thus the depth of the pond was considerably higher before any draining system was established than it is now.

Appellants contend that the water north of the tracks is discharged from a "natural reservoir" contrary to *Pettigrew v. Evansville*.[4] The case is distinguishable. In *Pettigrew* a landowner complained that the city threatened to drain a large body of standing water, created by the active participation of the city, onto his land. The court stated, at page 230:

[4] (1869), 25 Wis. 223.

". . . we know of no adjudged case where it has been held that the waters of a natural pond or reservoir upon the land of one person may be drained by him directly upon the land of another, greatly to his injury; nor where one owner has been allowed, by means of a ditch, trench, sewer or the like, to gather the surface water from his own land and throw it upon the land of another, so as materially to lessen its value and produce injury to the owner."

The important distinctions between *Pettigrew* and the case at bar are: (1) The water here would flow naturally to the adjoining land; (2) the water here was not in any standing or permanent body of water.

The facts of *Pettigrew* have been held to be "exceptional." [5] The facts in the instant situation are also clearly different from those in *Pettigrew*.

We conclude that under the facts presented here the city may divert the surface water under the "natural flow" theory.

(2) Diversion Incidental to Construction.

Assuming that the 58-acre area would not have drained naturally into the pond, what authority did Middleton have to divert surface water in conjunction with its program of street construction? It is undisputed that streets act as conduits in the Middleton drainage system. By constructing streets and gutters within its limits, a city may change the natural watercourse so as to increase the flow of water upon private land.[6] But a city may not collect water in a body and then cast it on the land in a large volume.[7] Appellants

[5] *Heth v. Fond du Lac* (1885), 63 Wis. 228, 23 N. W. 495.

[6] *Peck v. Baraboo* (1909), 141 Wis. 48, 122 N. W. 740; *Harp v. Baraboo* (1898), 101 Wis. 368, 77 N. W. 744; *Champion v. Crandon* (1893), 84 Wis. 405, 54 N. W. 775.

[7] *Champion v. Crandon, supra,* footnote 6; *Pettigrew v. Evansville, supra,* footnote 4.

have no quarrel with the statement of the law, but argue that it is inapplicable here because none of their properties adjoin any of the streets or ditches utilized in the drainage system. Although appellant Voss' property abuts Middleton street, it is not adjacent to any of the streets employed as part of the drainage system. No water may be channeled to this land. However, Park street cuts through the property of appellants Tiedeman and Lemcke. As this street is a part of the system, water may be run off on their land.

We conclude, therefore, that incidental to its street construction, the city had additional authority to divert surface water to the land of appellants Tiedeman and Lemcke.

*Second: Did appellants acquire a prescriptive right to the diversion of the surface water by the railroad embankment?* Regardless of the city's right to establish its drainage system, appellants contend that because Middleton acquiesced when the railroad constructed its embankment back around 1855, which blocked off the natural flow of water from the 58-acre tract to the Tiedeman pond, the city is bound by that change and appellants acquired a prescriptive right in the maintenance of that embankment and that such right was violated by the piercing of the embankment by the culvert.[8]

If an artificial body of water is created, landowners incidentally benefited are entitled to injunctive relief to prevent disturbance of the new state of the water.[9] Wisconsin

---

[8] Relying on 56 Am. Jur., Waters, p. 569, sec. 82, and p. 626, sec. 159.

[9] Anno. 88 A. L. R. 130; Harnsberger, Prescriptive Water Rights in Wisconsin, 1961 Wisconsin Law Review, 47. The rationale must be based more on equitable consideration than on the law of prescriptive rights because there is no adverse claim involved. The landowners make no hostile use of the water and the party creating the condition acquiesces in the former's use.

prescriptive-rights cases involve proprietors of lands which border bodies of water, who in some way relied on the new water level which was maintained by another's dam.[10] These cases hold that when the artificial level of the water is continued for a considerable period of time, usually twenty years, it becomes a natural condition. These cases do not control the present case. Appellants call the railroad grade, which blocked up the surface water, the "artificial condition." In the Wisconsin prescriptive-rights cases, the body of water affected—not the dam—constituted the "artificial condition." Also in these cases the landowners had made expenditures, constructed buildings, or in other ways relied on the new state of the water. In the instant case there is no evidence that appellants relied on the embankment in making any particular use of the land. They had always farmed their lands, a use perfectly consistent with the presence of water, and in acquiescence of the continued existence of the 22-acre pond which was largely fed by the area surrounding appellants' land.

In an Iowa case,[11] a culvert, which was laid under a railroad embankment, allowed water to follow its natural course upon the plaintiff's land. The embankment had shielded the land from water flow for over fifty years. The court found that there was no prescriptive right. The court said (at p. 1349):

"It is true defendants' land has for many years been shielded by the railroad embankment from surface water from the dominant land west of it. But it has acquired no prescriptive

[10] See for example *Minehan v. Murphy* (1912), 149 Wis. 14, 134 N. W. 1130; *Johnson v. Eimerman* (1909), 140 Wis. 327, 122 N. W. 775; *Pewaukee v. Savoy* (1899), 103 Wis. 271, 79 N. W. 436; *Smith v. Youmans* (1897), 96 Wis. 103, 70 N. W. 1115.

[11] *Stouder v. Dashner* (1951), 242 Iowa 1340, 49 N. W. (2d) 859.

right to such protection. *Bones v. Chicago, R. I. & P. Ry. Co.,* 145 Iowa 222, 229, 120 N. W. 717; *Hinkle v. Chicago, R. I. & P. Ry. Co.,* 208 Iowa 1366, 227 N. W. 419; *King v. Chicago, B. & Q. Ry. Co.,* 71 Iowa 696, 698, 29 N. W. 406, 407."

The appellants have not acquired prescriptive rights. There is lacking that degree of reliance upon the embankment which is necessary in order to invoke the equitable doctrine of prescription.

*Third: Are appellants entitled to injunctive relief in this situation?* Even assuming that the city had violated its authority in putting through the new drainage system or even assuming that appellants had prescriptive rights that had been breached by installing the disputed culvert,[12] injunctive relief should be granted only where there is irreparable injury.[13] Acts which destroy or cause serious change to property constitute irreparable injury.[14]

The record shows no irreparable injury caused to any of the appellants by the outpouring of water through the 30-inch culvert that runs through the embankment, under the tracks and Park street and out onto the street right-of-way

---

[12] Even if there were a prescriptive right that could be urged against the railroad, such a right cannot be urged against the public. See *Stouder v. Dashner, supra,* footnote 11; see also *Stuart v. Gilbert* (1934), 215 Wis. 546, 255 N. W. 142; and *Klinkert v. Racine* (1922), 177 Wis. 200, 188 N. W. 72, which held that adverse possession will not run against the city. As discussed in footnote 9, *supra,* there is no element of hostility in a prescriptive right while there is in adverse possession. These doctrines, however, are grounded on similar notions, and support the proposition that prescriptive rights cannot be asserted against the city.

[13] *Hartung v. Milwaukee County* (1957), 2 Wis. (2d) 269, 86 N. W. (2d) 475, 87 N. W. (2d) 799; *Maitland v. Twin City Aviation Corp.* (1949), 254 Wis. 541, 37 N. W. (2d) 74.

[14] *Ferguson v. Kenosha* (1958), 5 Wis. (2d) 556, 93 N. W. (2d) 460.

just adjacent to the pond. Appellant Voss was unaware of any damage to his land. Appellant Lemcke admits that his property had suffered no physical damage. Appellant Tiedeman had no damage to any buildings, but felt that the value of his property was being lessened. Appellants' real-estate expert was unaware of whether the pond level had risen.

As previously discussed, the evidence supports the trial court's finding that the water level in the pond has not increased after the construction. The drainage area of 58 acres contributes only 25 percent of the runoff to the pond (there were another 158 acres). Inasmuch as the 22-acre pond on Tiedeman's property has been fed by an area three times as large as the Middleton area, it is doubtful that the small increase, if any, in the water volume that could possibly be due to the Middleton drainage system appreciably affects the value of his land. It is questionable whether any of the appellants demonstrated enough harm to be entitled to injunctive relief.

*By the Court.*—Judgment affirmed. Costs on this appeal, including costs for printing pages of its brief in excess of forty, awarded to respondent.