GETKA and another, Respondents, v. LADER and others, Appellants.

*Nos. 169, 604. Argued January 6, 1976.—Decided February 3, 1976.*
(Also reported in 238 N. W. 2d 87.)

238

For the appellants there were briefs and oral argument by *Jacob Geffs* of Clinton.

For the respondents there was a brief by *Fulton, Lloyd, Konicek & Phenicie,* and oral argument by *Patrick Lloyd,* all of Burlington.

ROBERT W. HANSEN, J.  As to the right of a landowner to drain surface water from his land and pass it onto the land of a neighbor, the general rule in this state for a long time was that such surface water was recognized as a "common enemy" and that such landowner could "fight off or control" such surface water as he will or is able.[1]

Recently, in respect to surface waters, this court abandoned the "common enemy" test and substituted a "rea-

[1] *See: Borchsenius v. Chicago, St. Paul, Minneapolis & Omaha Ry. Co.* (1897), 96 Wis. 448, 450, 71 N. W. 884, this court holding: "Surface water is recognized as a common enemy, which each proprietor may fight off or control as he will or is able, either by retention, diversion, repulsion, or altered transmission; so that no cause of action arises for such interference, even if some injury occurs, causing damage."

sonable use" rule.[2] Under the "reasonable use" approach, the gravity of the harm is to be weighed against the utility of the conduct,[3] and landowners, diverting surface waters, are no longer "protected by the common enemy doctrine."[4] However, the adoption of the "reasonable use" rule was made prospective only,[5] and in cases, like the one now before us, the conduct of a landowner in discharging surface waters onto the land of another remains "immunized by the common enemy rule."[6]

Since the case now before us does not come within the "prospective only" mandate of *Deetz*, we must here apply the "common enemy" rule in resolving the issues presented. The leading case on the "common enemy" rule, and as to a significant exception to such general rule, is *Shaw v. Ward.*[7] It is made the leading case on diverting surface waters by the cases since, that have cited, quoted and accepted it as controlling. Before discussing such subsequent decisions, we will summarize the facts before the court in *Shaw,* as set forth by the court in its decision:

"There is on respondents' lands a depression covering several acres and of the depth of about one foot, toward which, under natural conditions, surface water from a considerable territory, including lands of respondents, flowed and in which the same, to the level of a draw to the east, was retained, the surplus entering such draw and flowing somewhat southeasterly to and onto lands adjoining on the east; thence across the latter lands for a distance of half a mile or more to lands of appellants claimed to have been damaged; thence, except as retained on such lands, flowing further on to Galloway

---

[2] *State v. Deetz* (1974), 66 Wis. 2d 1, 224 N. W. 2d 407.

[3] *Id.* at page 20.

[4] *Id.* at page 19.

[5] *Id.* at page 24.

[6] *Id.* at page 24.

[7] (1907), 131 Wis. 646, 111 N. W. 671.

creek east of such lands. The water retained in the depression or basin as aforesaid did not constitute a permanent body. It was not fed to any extent by springs, but was mere surface water which in times of dry weather disappeared by evaporation or absorption into the ground. . . . For a considerable period of time before this action was commenced there·was no pond of water on respondents' lands and none will be accumulated there in the future unless the flow to the adjoining lands be prevented."[8]

This court, in *Shaw*, saw the question presented as being whether the landowners had the legal right to prevent surface water from accumulating by causing the same to flow to adjoining lands by an artificial course.[9] Answering that question, this court, in *Shaw*, held that landowners had the legal right to rid their lands of surface water by causing the same to flow in the natural course of drainage onto adjoining lands.[10] The exception to such application of the "common enemy" rule was held to be only that a landowner cannot collect surface water "in a reservoir" and then discharge the same directly onto the land of another to his injury.[11]  In

[8] *Id.* at pages 652, 653.

[9] *Id.* at page 653.

[10] *Id.* at page 658, this court holding: "Respondents have a legal right, as we have seen, to rid their lands of surface water as it comes thereon from any source by permitting or causing the same, by such means as may be reasonably necessary, to flow in the natural course of drainage to and onto adjoining lands, though the same may by natural or by artificial means for which they are not responsible reach and spread out over appellants' lands. In so doing they but exercise the common right of every person to defend his premises against surface water."

[11] *Id.* at pages 653, 654, saying of the exception to the general rule, noted in the earlier case of *Pettigrew v. Evansville* (1869), 25 Wis. 223, 3 Am. Rep. 50, that ". . . the doctrine of *Pettigrew v. Evansville* . . . and similar cases, *viz.:* that one landowner cannot rightfully collect surface water on his premises in a reservoir and then discharge the same directly onto the land of another to

*Shaw,* the court refused to order "restoration" of a reservoir so that surface waters would, as formerly, be there retained.[12] Instead, it held that causing surface waters to pass onto adjoining premises in a ditch is "not understood to be the accumulation of water and casting it upon the adjoining land" that would escape the rule by coming within the exception to it.[13]

In several cases since, the *Shaw* statement of the general rule and the *Shaw* limiting of the exception to it have been followed by this court. In one such, the *Vick Case,*[14] this court reversed a trial court's enjoining of a landowner from tile draining surface waters onto the lower land of his neighbor, citing *Shaw* and terming its holding "a reasonable rule."[15] In another decision,

---

his injury, or onto land near the premises of another so that it will reach the same in a large volume to the material injury thereof, do not fit the case, but the common-law doctrine, so often approved by this court, in respect to the right of one landowner to defend his premises against and rid the same of surface water, though consequential injuries may thereby be caused to other lands, subject to the limitation mentioned in *Pettigrew v. Evansville, supra,* governs the situation."

[12] *Id.* at page 653, the court stating: ". . . it will be seen that the major purpose of this action is not to prevent the casting of a pond of water, accumulated on respondents' lands, therefrom, resulting in its reaching appellants' lands to their damage, but is to compel the restoration of the reservoir on the former's lands so the surface water falling or flowing thereon will, as formerly, be there retained instead of passing to the lands of the adjoining owners and thence to those of appellants."

[13] *Id.* at page 655.

[14] *Vick v. Strehmel* (1928), 197 Wis. 366, 222 N. W. 307.

[15] *Id.* at page 372, this court stating: "It may be conceded, we think, that this court has not strictly followed the common-law rule as to the right of the owner of the dominant estate to cast surface waters upon the servient estate, but the rule as laid down in *Shaw v. Ward, supra,* and *Manteufel v. Wetzel, supra* [(1907), 133 Wis. 619, 114 N. W. 91.] was deliberately adopted by this court, and, it being a reasonable rule, we think *stare decisis* should apply, since it has been a rule of property for over twenty years."

the *National Drive-In Case*,[16] this court found no liability on the part of a landowner whose grading and graveling had prevented natural absorption of surface waters into the soil and resulted in a large amount of water being drained onto adjoining land.[17] Quoting *Shaw* and applying the *Shaw* holding, our court held that there was ". . . no cause of action for damages caused by drainage of surface waters, either because of the installation of tile drains or by changing the natural flow of such waters."[18] In a more recent holding, the *Tiedeman Case*,[19] while not directly citing *Shaw*, this court reaffirmed the narrowness of the exception created by *Pettigrew*,[20] and upheld the right of a city to build a storm sewer that would discharge water onto plaintiff's

[16] *Watters v. National Drive-In, Inc.* (1954), 266 Wis. 432, 63 N. W. 2d 708.

[17] *Id.* at page 436, this court stating: "It is pointed out in the *Shaw Case* that the general rule has its limitations . . ." but *(Shaw v. Ward*, p 655): " 'The mere change of the surface of one's premises where reasonably necessary to cause surface water to flow therefrom by the natural course of drainage, even to the extent of causing it to pass onto adjoining premises in a ditch, is not understood to be the accumulation of water and casting it upon adjoining land within the doctrine of *Pettigrew v. Evansville, . . .'* "

[18] *Id.* at page 436.

[19] *Tiedeman v. Middleton* (1964), 25 Wis. 2d 443, 130 N. W. 2d 783.

[20] *Id.* at pages 451, 452, this court holding: "Appellants contend that the water north of the tracks is discharged from a 'natural reservoir' contrary to *Pettigrew v. Evansville*. The case is distinguishable. In *Pettigrew*, a landowner complained that the city threatened to drain a large body of standing water, created by the active participation of the city, onto his land. . . .

"The important distinctions between *Pettigrew* and the case at bar are: (1) The water here would flow naturally to the adjoining land; (2) the water here was not in any standing or permanent body of water.

"The facts of *Pettigrew* have been held to be 'exceptional.' " [The reference to 'exceptional' is in *Heth v. Fond du Lac* (1885), 63 Wis. 228, 23 N. W. 495.]

property. Noting that surface water not only evaporates into the air and percolates into the ground but that it also "ponds in low spots," this court in *Tiedeman* found there was no "standing or permanent body of water,"[21] and followed the "common enemy" doctrine.[22] All three cases *(Vick, National Drive-In* and *Tiedeman)*, it is submitted, reaffirm and follow the *Shaw* interpretation and application of the "common enemy" rule in this state.

With the facts in the case before us substantially similar to the fact situation in *Shaw*, and applying the "common enemy" rule as spelled out in *Shaw* and followed since, we hold that these landowning defendants are not liable for damages nor subject to injunction for causing surface waters on their lands to flow into the culvert and onto the land of the plaintiffs. So holding, we reverse and set aside the judgment of the trial court that enjoined the defendants from discharging such surface water into such culvert and onto the land of the plaintiffs. It may be assumed that a court which abandoned the "common enemy" rule for the "reasonable use" rule has no great enthusiasm for a result mandated under the rule it has since abandoned. But it is the "common enemy" rule that here controls, and it is that rule which we must and do here apply.

Setting aside the trial court injunction against the defendants does not, ipso facto, erase the contempt finding here made nor the trial court's assessment of liquidated damages of $100 per day ". . . until the aforesaid judgment has been fully complied with." Our

[21] *Id.* at pages 450, 452.

[22] *Id.* at page 449, the court holding: "Municipal corporations have the same rights in regard to surface waters as have individuals. A municipality may, therefore, channel surface water in its natural direction via conduits rather than over the surface or by percolation if no new watershed is tapped and the volume of water is not increased." Citing *Freeman v. Lake Mills* (1943), 243 Wis. 537, 11 N. W. 2d 181; *Manteufel v. Wetzel* (1907), 133 Wis. 619, 114 N. W. 91.

court has so held in a surface water case.[23] Where a court has jurisdiction over the subject matter and the parties, the fact that an order or judgment is erroneously or improvidently rendered does not justify a person in failing to abide by its terms.[24] The subsequent appeal and reversal of the injunction here does not alter the obligation of the defendants in this case to initially comply with such injunction until it was stayed or set aside.

The Wisconsin legislature has given to every court and every judge in this state the power to punish for contempt ". . . any neglect or violation of duty or any misconduct by which the rights or remedies of a party in an action or proceeding . . . may be defeated, impaired, impeded or prejudiced," for any ". . . disobedience to any lawful order, judgment or process of such court."[25] Here the defendants claim that: (1) There was not such disobedience to a court order; and (2) there was no proof of damages or impairment and prejudice to the rights of the plaintiffs.

As to the first of the two challenges, our court has held that ". . . it is essential in contempt cases that the thing ordered to be done be within the power of the person."[26] Here the defendants were ordered to discontinue discharging water into the culvert under Salt Box Road. The contempt hearing was held fourteen days after the granting of the injunction. At that hear-

---

[23] *See: Vick v. Strehmel, supra,* footnote 14, at page 373, this court holding:

"The judgment of the court in the main action had not been appealed from at the time the fine was assessed, nor had a stay been granted. It therefore was the duty of the defendant to comply therewith and stop up the drain. Failing to do so he was properly punished for contempt."

[24] *See:* 17 Am. Jur. 2d, *Contempt,* pp. 46–50, secs. 42, 43.

[25] Secs. 295.01 and 295.01 (3), Stats.

[26] *In re Adam's Rib, Inc. (Kaminsky)* (1968), 39 Wis. 2d 741, 746, 159 N. W. 2d 643.

ing both sides testified that defendants had attempted to close the drains but that there was still some water leaking out. Their attempts to stop the drainage consisted of stuffing boards, bags and cement in the tile and dumping gravel at the point where the water entered the culvert. Whether these attempts were sufficient compliance, or whether more could and should have been done, is an issue of fact for the judge, with the standard of review whether the trial court's findings ". . . are not unsupported and are not against the great weight and clear preponderance of the evidence."[27] Applying this test, we affirm the trial court's holding these defendants in contempt.

As to the trial court's ordering the defendants to pay $100 per day as "liquidated damages," the question presented is much more difficult. It is true in contempt cases that the award of damages, as with fine or imprisonment, is primarily remedial, the main purpose being to enforce a judgment entered by a court as a result of the determination of private rights.[28] The statute provides that a court, upon a finding of contempt, may ". . . order a sufficient sum to be paid by the defendant to such party to indemnify him and to satisfy his costs and expenses, instead of imposing a fine upon such defendant. . . ."[29] So the power to assess damages in contempt situations is limited to an indemnification for actual damages. An award of damages cannot be considered to be a fine, which is limited by statute to $250.[30] In the main action the trial court refused to award damages, finding that: "The matter of damages has not been established with sufficient certainty. . . ." We find no basis for holding that such uncertainty was

---

[27] *Id.* at pages 746, 747.

[28] *Upper Lakes Shipping v. Seafarers' International Union* (1963), 22 Wis. 2d 7, 13, 125 N. W. 2d 324.

[29] Sec. 295.14, Stats.

[30] Sec. 295.14, Stats.

here removed in the two weeks between the entry of the judgment and the contempt hearing. As to an award of damages in a civil contempt proceeding, our court has held: "The general rule is that damages must be proved with reasonable certainty and cannot be based on conjecture."[31] We hold that such test was not here met, and reverse and set aside the award of damages of $100 per day to plaintiffs in the judgment finding defendants in contempt of court.

Finding the award of liquidated damages of $100 per day here not proper under the statute does not relieve the defendants from other penalties based on the finding of contempt. It only relieves them from the particular penalty imposed. The disposition thus and then indicated is for this court, finding the penalty of liquidated damages here inappropriate, to affirm the judgment finding the defendants in contempt but reverse as to damages and remand the case for the imposition of either a fine or imprisonment under the statute. While imprisonment would hardly recommend itself as an indicated penalty for the type and degree of contempt here involved, a fine, not to exceed $250 could, under sec. 295.14, Stats., be imposed. However, our court has held that the reversal of the original judgment, here the injunction, may be considered by the court in determining punishment for contempt.[32] Ordinarily, this would be a factor to be considered by the trial court in determining the appropriate penalty. However, since the imposition of

[31] *Novo Industrial Corp. v. Nissen* (1966), 30 Wis. 2d 123, 131, 140 N. W. 2d 280, this court also holding: "When damages are susceptible of precise proof or of estimation by someone having knowledge, this proof must be adduced."

[32] *State ex rel. Fowler v. Circuit Court for Green Lake County* (1898), 98 Wis. 143, 149, 150, 73 N. W. 788, this court holding: "While the fact that an injunction was erroneously issued in the first instance affords no justification or excuse for its violation, still such fact may properly be taken into consideration in awarding punishment for its breach."

penalty in contempt situations has as its main purpose ". . . to enforce a judgment entered by a court as a result of the determination of private rights,"[33] we find that such primary purpose would hardly here be served by remand for imposition of penalty. Balancing all the factors involved, we hold that affirmance of the finding of contempt and setting aside the imposition of $100 per day liquidated damages without remand for imposition of a substitute penalty is an appropriate final disposition of the appeal here taken. In view of this disposition of the contempt appeal, we do not award costs, as otherwise we would have, to the appellant and, instead, order and direct that the parties pay their own costs and disbursements on the two appeals here brought.

*By the Court.—Case No. 169.* Judgment reversed, and cause remanded with directions to the trial court to enter judgment dismissing the complaint of the plaintiffs-respondents, no costs to either party.

*Case No. 604.* Judgment of contempt affirmed, and award of liquidated damages to plaintiffs-respondents reversed and set aside, no costs to either party.

---

[33] *Upper Lakes Shipping v. Seafarers' International Union, supra,* footnote 28, at page 13.