Michael SHANAK, Jr., and Virginia Shanak, d/b/a
Shanak Foundry & Machine Company, Plaintiffs-
Appellants,†

v.

CITY OF WAUPACA, Defendant-Respondent.

Court of Appeals

*No. 92–1055. Submitted on briefs April 2, 1993.—Decided
May 19, 1994.*

(Also reported in 518 N.W.2d 310.)

†Petition to review denied.

568

570

For the plaintiffs-appellants the cause was submitted on the brief of *Thomas Terwilliger* and *Jeffrey J. Strande* of *Terwilliger, Wakeen, Piehler & Conway, S.C.* of Wausau.

For the defendant-respondent the cause was submitted on the brief of *Steven M. Anderson* of *Ruder, Ware & Michler, S.C.* of Wausau and *Nancy J. Krueger* of *Menn, Nelson, Sharratt, Teetaert & Beisenstein, Ltd.* of Appleton.

Before Eich, C.J., Gartzke, P.J., and Dykman, J.

GARTZKE, P.J. Michael Shanak, Jr. and Virginia Shanak d/b/a Shanak Foundry & Machine Company (Shanaks) appeal from a judgment in favor of the City of Waupaca (City). We affirm the judgment in part and reverse in part.

## I. NATURE OF THE CASE

Shanaks own a millpond, dike, dam, hydroelectric plant and machine shop, all in the City. The Crystal River feeds the pond. The pond provides water to the hydroelectric plant which produces power for their machine shop and for sale to a utility. The dam, which regulates the pond's water level, is built against the pond side of a stone arch in the dike. The dam consists of a row of four vertical I-beams and a set of horizontal "stop logs." The I-beams provide back support for the stop logs which hold back the water. The arch acts both as a back support for the I-beams and as a bridge for Riverside Drive[1] which runs on top of the dike. Any water that escapes over the top stop log flows through the arch culvert.

One group of issues clusters around the stone arch. In August 1981 the United States Army Corps of Engineers advised Shanaks that the bridge and arch needed repair and recommended that the arch be replaced or rehabilitated. Shanaks sent a copy of the army corps' report to the City. In July 1983, after inspecting the structure, DNR sent a letter to Shanaks and a copy to the City. In the letter, DNR stated that the arch was in a bad state of disrepair and represented a hazard in terms of both dam safety and bridge safety. In response to that letter, the City closed Riverside Drive and installed barricades. According to the City's director of public works, the City intended to reopen the road once the repairs were made to the arch. In August 1987, after making another inspection, DNR found that the dam was unsafe and dangerous and ordered Shanaks to lower the millpond's water level and make repairs,

---

[1] Riverside Drive was previously known as Churchill Street.

or drain the pond and apply for a permit to abandon the dam. The order was attached to DNR's letter which stated that until the arch was repaired the pond level could not be raised beyond that stated in the order.

Shanaks brought this action for damages arising out of the City's failure to repair the arch and for an injunction to require the City to make future repairs. When the action was commenced, the City and Shanaks caused the repairs to be made and each paid half. They agreed that the party legally responsible for the maintenance and repair of the arch would reimburse the other for half the cost of the repairs.

The second group of issues concerns the millpond. Five city storm sewers empty into it, and Shanaks claim that the sewers deposit materials into the pond, reducing its capacity and the hydroelectric plant's production of electric power. Shanaks seek an injunction to stop the City from depositing materials in the pond.[2]

The jury found that the City owns the arch and that Shanaks were damaged by the City's failure to maintain it. The jury determined that Shanaks' damages consisted of $3,700 for diesel-generating expenses incurred while the pond was drawn down to repair the arch, $8,900 for connecting with a utility to obtain electricity which the hydroelectric plant could not produce during the drawdown, $6,000 for damage to the hydroelectric equipment during the drawdown due to material unavoidably drawn into the equipment, nothing for the cost of purchasing electric power from the utility, $10,000 loss of business profits resulting from the closing of Riverside Drive and $3,000 for the loss of business profits resulting from the drawdown. The jury also found that the materials deposited in the pond by

[2] Shanaks seek only injunctive relief. We do not decide whether they are entitled to damages.

the City's storm sewers interfere with Shanaks' flowage rights.

The trial court treated the verdict as advisory, because the case raised only issues of law, except as to Shanaks' damages. The court concluded that Shanaks are responsible for the arch repairs, they are not entitled to an injunction to compel the City to repair or raze the arch, and they are not entitled to an injunction to stop the City from depositing materials in the pond through its sewers. The court entered a judgment conforming to those conclusions, including $9,553.27 in favor of the City to reimburse it for its half of the cost to repair the arch.

## II. ISSUES AND DECISION

The issues and our resolution of them are as follows:

(A) Are Shanaks' claims barred for failure to give timely notice of claim to the City under § 893.80, STATS.? We conclude that § 893.80 bars only their claim for loss of business profits resulting from the closing of Riverside Drive.

(B) Is the City responsible for repairs to the arch? We hold that the City is responsible.

(C) Is Shanaks' action for damages relating to the arch repairs barred by the statute of limitations in § 893.43, STATS.? We conclude it is not.

(D) Are Shanaks entitled to damages incident to repair resulting from the City's failure to maintain the arch? We conclude that they are.

(E) Are Shanaks entitled to damages for loss of business profits resulting from the closing of Riverside Drive? We conclude they are not.

579

(F) Are Shanaks entitled to injunctive relief requiring the City to maintain the arch in perpetuity or to remove it? We conclude they are not.

(G) Did the trial court properly allow the jury to offset payments Shanaks received from a utility for the electricity they sold to the utility (after the pond's water level was returned to normal) against the cost Shanaks incurred in connecting with the utility to obtain electricity while the pond was drawn down? We conclude the court erred but the error was harmless.

(H) Is the award of damages to Shanaks insufficient? We conclude it is sufficient, except as to Shanaks' expense for power during the pond drawdown.

(I) Does the "reasonable use doctrine" regarding surface waters apply to the deposition of materials on the millpond bed by the City through its storm sewers? We conclude that the doctrine applies.

(J) Is the City's use of its storm sewer outlets reasonable under that doctrine? We conclude it is.

(K) Are Shanaks entitled to an injunction by virtue of § 844.01, STATS., or Article I, Section 9 of the Wisconsin Constitution to stop the City from depositing materials via the storm sewer system into the millpond? We conclude that they are not.

## III. DISCUSSION

A. Notice of Claim: Section 893.80, STATS.

Section 893.80(1)(a), STATS., provides in material part that no action may be brought against a municipality unless:

> Within 120 days after the happening of the event giving rise to the claim, written notice of the circum-

stances of the claim . . . is served on the . . . [municipal] corporation. . . . Failure to give the requisite notice shall not bar action on the claim if the . . . [municipal] corporation . . . had actual notice of the claim and the claimant shows to the satisfaction of the court that the delay or failure to give the requisite notice has not been prejudicial to the . . . [municipal] corporation . . . . .

■

In its answer the City asserted that Shanaks failed to give notice of claim. But the trial court rejected that assertion. Given the undisputed facts of this case, the issue is one of law which we decide *de novo*. Shanaks assert that they have complied with § 893.80, STATS. We conclude that they have complied, except in regard to their claim for lost business profits resulting from the closing of Riverside Drive, which we discuss later in this opinion.

■

On August 18, 1987, DNR issued a decision and order that required Shanaks to reduce the water level behind the dam and to repair the dam and arch, or to drain the pond and seek permission to abandon the dam. Pursuant to DNR's order, the water level was lowered, resulting in a substantial reduction of hydroelectric power generating capacity. The repairs were made. Because the order required that the pond be drawn down and repairs made, or that it be drained and permission to abandon sought, Shanaks needed to make the repairs to continue operating their hydroelectric plant. During the drawdown Shanaks became aware of a substantial amount of silt and other deposits allegedly caused by the City's storm sewer system. The event giving rise to Shanaks' claims for cost of repairs, reduced electrical power generating capacity, hydroe-

581

lectric equipment damage and lost profits from the drawdown was DNR's order requiring action. Shanaks gave the City notice of the circumstances of their claims for cost of repairs, reduced power generating capacity, equipment damage and lost profits from the drawdown on November 14, 1987, within 120 days of DNR's order. Therefore § 893.80, STATS., does not bar these claims.

### B. City's Duty to Repair Arch

The trial court reasoned that the deeds in Shanaks' chain of title control who owns the arch, and the duty to repair it attends its ownership. The court ruled on the basis of the prior conveyances in Shanaks' chain of title that the City holds an easement over Shanaks' land, but because they own the land, they own the arch and must maintain and repair it. The court therefore gave the City judgment for the amount it paid to repair the arch.

We agree that the City holds an easement over Shanaks' land. The deeds in the chain of title to Shanaks convey the real estate, "together with the dam and flowage rights and [the] right to maintain the same," and contain the following phrase or a variation of it: "subject only to the right of the City of Waupaca to cross said dam as a highway." The deed to the Shanaks includes "all water power and rights of flowage now owned by first party. Subject to the right of the City of Waupaca to cross said dam at the highway . . . ."

Nothing in the chain of title expressly conveys an easement to the City. Whether the City possesses an easement rests solely on inference from the conveyances in the chain of title and from the conduct of the prior owners and the City. That the conveyances in the

582

chain of title contain the quoted "subject to" language is a fact from which it is reasonable to infer that the City possesses an easement, however acquired, to cross the dam.[3] Indeed, that is the only reasonable inference, when the prior conveyances are considered in light of the conduct of prior owners and the City.

The parcel's history includes the following. In 1876 Shanaks' property was known as the Woolen Mills. In that year the Waupaca Common Council resolved that the City pay the mill owner $400 "for putting in the . . . bridge . . . at the Woolen Mills" and pay the mill owner each year for ten years for maintaining the bridge. In 1897 the council instructed its street committee "to repair the bridge." In 1900 the council received bids "for the purpose of building a stone bridge at the Woolen Mills on Churchill Street,"[4] authorized the street committee to contract to build it and "accepted" it once it was built. In 1916 the council appropriated funds to repair the "bridge."

---

[3] The "subject to" provisions in the prior conveyances do not convey an easement to the City. A conveyance "subject to" an easement in favor of a person not a party to the conveyance does not grant an easement to that person, in the absence of other circumstances. See Behm v. Saeli, 560 So. 2d 431, 432 (Fla. Dist. Ct. App. 1990) (words "subject to" insufficient by themselves to determine whether easement was created); Robertia v. Pine Tree Water Control Dist., 516 So. 2d 1012, 1013 (Fla. Dist. Ct. App. 1987) (words "subject to" in deed insufficient to reserve easement absent evidence of intention to create easement); Wild River Adventures, Inc. v. Board of Trustees of Sch. Dist. No. 8, 812 P.2d 344, 346-47 (Mont. 1991) (normally "subject to" wording does not indicate creation of property rights); Price v. Walker, 383 S.E.2d 686, 689 (N.C. Ct. App. 1989) ("subject to" wording does not create easement).

[4] It is undisputed that the stone bridge and the stone arch at issue in this case are one and the same.

■

We need not decide whether the City owns the arch or the Shanaks do.[5] The holder of an easement of way is entitled to make reasonable improvements or repairs to the easement, so long as the holder does not increase the burden on the servient estate. *Knuth v. Vogels*, 265 Wis. 341, 345, 61 N.W.2d 301, 303 (1953). When, as here, the City's easement is the right to pass over a dam and waterway, and that passage is necessary to travel on a public street, the City must have the right to bridge the gap by arch or otherwise. Without it the easement would be useless.[6]

■

We conclude that the City has a duty to repair the arch. Absent an agreement to the contrary, the holder of an easement must repair the easement. *Koch v. Hustis*, 113 Wis. 599, 604, 87 N.W. 834, 835-36, *aff'd*, 113 Wis. 604, 89 N.W. 838 (1902). *See also* JON W. BRUCE AND JAMES W. ELY, JR., THE LAW OF EASEMENTS

[5] The issue before us is who is responsible for repairs to the arch. Because the duty to repair does not depend on ownership, we reverse that part of the trial court's judgment declaring that the Shanaks own the arch (described in the judgment as the "dam/bridge"). However, we express no opinion on whether the trial court's analysis was correct.

[6] In *Hammond v. Hammond*, 101 A. 855 (Pa. 1917), the owner conveyed land with an easement from it "across the creek" to a public road. For some twenty years the easement holder forded the creek, and then built a bridge because it was difficult and occasionally impossible and unsafe to ford the creek. The *Hammond* court held that the holder could "improve it in such manner as to make it fit for the purpose expressed in the grant, and in so doing may construct a bridge over a ravine or creek, if it be done in such way as to cause the least practicable damage to the owner of the servient tenement . . . ." *Id.* at 857.

AND LICENSES IN LAND § 7.09(1), at 7-66-7-67 (1988 & Supp. 1993), and cases cited. Combining the holder's duty to repair the easement with the right to improve it, we conclude that the holder must repair the improvement as well, unless the owner and holder have otherwise agreed. Because the record contains no evidence of any agreement that Shanaks or their predecessors must repair the arch, we hold that the City is obligated to do so.

We therefore conclude that the judgment in favor of the City for $9,553.27 must be reversed. The matter is remanded for the trial court to enter judgment in favor of Shanaks for the amount Shanaks spent for arch repairs.

C. Statute of Limitations: Section 893.43, STATS.

Shanaks filed this action on May 6, 1988. The City argues that Shanaks' claim for damages resulting from the City's failure to maintain the arch is barred by the six-year statute of limitations in § 893.43, STATS. That statute provides: "An action upon any contract, obligation or liability, express or implied, including an action to recover fees for professional services, except those mentioned in s. 893.40, shall be commenced within 6 years after the cause of action accrues or be barred."

The City moved for summary judgment based on § 893.43, STATS. The court denied the motion. Given the undisputed facts before us, the applicability of the statute of limitations is a question of law for our *de novo* review. We are satisfied that it does not apply.

As we have concluded, the City holds an easement over Shanaks' land, and by virtue of that easement it had the right to construct the arch as an improvement. It therefore owes a duty to Shanaks to keep the arch

repaired, but the duty is not contractual. The duty arises out of the relationship between the parties as easement holder and landowner, respectively.

D. Damages Incident to Repairs

Because the City has the duty to maintain and repair the arch, it is liable to Shanaks for their damages resulting from the breach of that duty. In the absence of an agreement to the contrary, the holder of an easement is liable to the landowner for repair costs the landowner incurs due to the holder's neglect to repair. *See Walsh v. United States*, 672 F.2d 746, 749 (9th Cir. 1982) (easement holder has duty to repair and maintain to prevent unreasonable interference with the uses of the servient estate and is liable for damages proximately caused by failure or neglect to perform such duty); *Powers v. Grenier Constr., Inc.*, 524 A.2d 667, 669 (Conn. App. Ct. 1987) (landowner entitled to recover damages to property caused by easement holder's failure to repair its deteriorated drainage system, because absent agreement to the contrary, holder must maintain easement so as to prevent injury to servient estate); *Lynch v. Keck*, 263 N.E.2d 176, 183 (Ind. Ct. App. 1970) (easement holder may be liable for injuries caused by holder's neglect to repair). Shanaks are therefore entitled to recover not only the cost of repairs to the arch but also damages incident to the repairs, such as loss of electric power, damage to their hydroelectric equipment while the pond was drawn down and loss of business profits caused by the drawdown.

E. Loss of Business from Street Closing

586

The jury found that Shanaks' damages included $10,000 of lost business profits caused by the City's closing Riverside Drive. We conclude that the notice of claim statute, § 893.80, STATS., bars such a recovery.

In order to bring an action against a municipality, a claimant must give it the required written notice within 120 days after the happening of the event giving rise to the claim, or the claimant must show that the municipality had actual notice and was not prejudiced by the claimant's failure to give written notice. Section 893.80(1), STATS. The City closed Riverside Drive in 1983 when it determined that the bridge was unsafe. The event giving rise to Shanaks' claim of lost business profits was the closing of the street. Shanaks failed to give the City notice of its lost business profits until 1987, long after 120 days had elapsed.

■

The City claims that it was prejudiced by Shanaks' failure to give notice. It asserts that had it received notice within 120 days after it closed the street it might have had a chance to mitigate damages. Instead, the City claims, Shanaks allegedly incurred four years of lost business profits before giving notice. We conclude that the action is barred by § 893.80, STATS., for failure to give notice of claim within 120 days of the event, because Shanaks have not shown that the City was not prejudiced by their failure to give notice.

### F. Injunctive Relief for Future Arch Repairs

The court reasoned that because Shanaks had failed to prove irreparable injury and lack of an adequate remedy, they are not entitled to an injunction requiring the City to repair the arch in perpetuity. The court added that the cost to comply with such an

injunction would be substantial and that balancing the equities did not favor an injunction.

Our review of a trial court's decision to grant or deny injunctive relief is limited to whether the court erroneously exercised its discretion. *Pure Milk Prods. Coop. v. National Farmers Org.*, 90 Wis. 2d 781, 800, 280 N.W.2d 691, 700 (1979). We are satisfied that the trial court properly exercised its discretion.

To obtain an injunction, a plaintiff must show a sufficient probability that the defendant's future conduct will violate the plaintiff's right and will irreparably injure the plaintiff. *Bubolz v. Dane County*, 159 Wis. 2d 284, 296, 464 N.W.2d 67, 72 (Ct. App. 1990). Shanaks have not shown that in the future the City will fail to maintain the arch as long as it utilizes the arch and its maintenance is necessary.

### G. Power Sold to Wisconsin Public Service

Prior to the millpond drawdown, Shanaks used the hydroelectric power they produced to run their three-phase machinery. After the drawdown, insufficient water existed to turn the generator. Shanaks switched to diesel power to produce electricity, but when that became uneconomical they connected with Wisconsin Public Service (WPS) for power. The court permitted Shanaks to submit evidence concerning the cost of the connection and of the power they purchased from WPS while the pond was drawn down. After the pond's water level was returned to normal, Shanaks sold excess power generated by their hydroelectric system to WPS. The court permitted the City to put in evidence the payments Shanaks received for that power.

Shanaks argue that under the collateral source rule the WPS payments to them do not affect their damages. Under that rule, the damages awarded to a plaintiff in a tort case are not reduced by compensation the plaintiff received from another source. *Payne v. Bilco Co.*, 54 Wis. 2d 424, 433, 195 N.W.2d 641, 647 (1972). The collateral source rule does not apply here.

Shanaks submitted evidence that their cost to connect to WPS was $17,834, and their cost of purchasing power from WPS while the pond was drawn down was $1,647. The City submitted evidence that WPS paid Shanaks $9,622 for power WPS purchased from them up to and during the trial. The trial court instructed the jury that it should determine whether the payments by WPS to Shanaks "should be offset against any amount, if any, you award to [Shanaks] for the cost [Shanaks] incurred in connecting to [WPS's] three-phase power." Because the jury awarded only $8,900 for the cost of that connection, we infer that the jury applied almost all of WPS's payments to Shanaks, $9,622, against the $17,834 cost to connect. The jury awarded nothing for Shanaks' cost of purchasing power from WPS.

Neither the cost of the connection nor the WPS payments to Shanaks for power should have been allowed in evidence. Before the drawdown, Shanaks produced their own power to meet their needs. When Shanaks were again producing power, they not only met their own needs but had surplus power to sell to WPS. Their connection with WPS turned out to be a profitable investment rather than an expense incident to the arch repairs. Their return on that investment is the value of the power they sold to WPS. Shanaks are not entitled to recover the cost of their investment under the guise of damages. Neither the cost of the

connection nor the WPS payments are relevant to Shanaks' damages. However, the City did not object to the evidence regarding the cost of connection or to inclusion of that cost in the damages question in the verdict. We therefore work with the verdict.

When the jury set off WPS's payments against Shanaks' connection cost, that reduced Shanaks' recovery for the cost of connection, a cost which they should not have recovered in the first place. Thus, the error in allowing the WPS payments in evidence did not harm the Shanaks. Because it did not affect their substantial rights, they are not entitled to reversal or a new trial. Section 805.18(2), STATS.

However, because the jury allowed nothing to Shanaks for the cost of purchasing power from WPS during the drawdown, and it is undisputed that the cost was $1,647, the trial court must change the answer to that part of the verdict from zero to that amount and add it to the judgment in favor of Shanaks.

H. Sufficiency of Damage Award

Shanaks contend that because they submitted uncontradicted evidence of damages exceeding those awarded to them, the damages awarded are insufficient. Without explaining its ruling, the trial court declined to change the jury's answers regarding damages. For that reason, we do not review its decision for an erroneous exercise of discretion. The issue is whether any credible evidence supports the jury's award. *Ide v. Wamser*, 22 Wis. 2d 325, 331, 126 N.W.2d 59, 62 (1964).

No need exists for us to detail and discuss the evidence. We have reviewed the record and are satisfied that it supports the verdict, except as to the damages resulting from the street closing, and except as to the Shanaks' cost of purchasing power during the drawdown, all as previously discussed.

## I. Applicability of "Reasonable Use Doctrine" to Deposits in Mill Pond

Shanaks contend that as a result of the City's storm sewers' depositing materials in their millpond, the millpond is gradually filling in which reduces the water available to generate hydroelectric power.[7] They contend that the pond will entirely fill with deposits, and they seek an injunction to prevent the City from continuing to deposit materials in the pond through its sewer system.

The trial court dismissed Shanaks' claim for an injunction on the ground that it is not justified under the "reasonable use doctrine." Shanaks contend that the court erred. The doctrine, in their view, applies only to surface water and not to materials deposited by surface water. We reject their view.

Until the supreme court's decision in *State v. Deetz*, 66 Wis. 2d 1, 224 N.W.2d 407 (1974), the case law of this state treated surface water as a common enemy which each property owner could fight off or control by retention, diversion, repulsion or altered

---

[7] Shanaks presented testimony of the following: Sedimentation reduces the depth of a pond. A shallow pond is heated by the sun to a higher temperature and therefore loses more water by evaporation, than does a deep pond. The higher the evaporative loss from the pond, the lower the amount of water available to pass through the turbine in the powerhouse.

transmission. No cause of action arose from such conduct even if some injury occurred to the plaintiff. *Id.* at 10, 224 N.W.2d at 411-12. The *Deetz* court held that the common enemy rule "no longer comports with the realities of our society." *Id.* at 16, 224 N.W.2d at 415. The court concluded that the "reasonable use doctrine as set forth in the Restatement of Torts better comports with the realities of modern society than does the common enemy doctrine . . . ." *Id.* at 18, 224 N.W.2d at 416. The court abandoned the common enemy rule in favor of the Restatement standards.

The *Deetz* court relied on a tentative draft of what is now the RESTATEMENT (SECOND) OF TORTS §§ 822-833 (1977). Those sections of the Restatement, as well as the tentative draft to the Restatement, extended the reasonableness rule to all "invasions" of land and interests in land. *See Deetz*, 66 Wis. 2d at 16, 224 N.W.2d at 415.

Indeed, the factual situation in *Deetz* included deposits carried by surface water. While the court discussed the "common enemy" doctrine, the state had brought an action against the defendants "for the purpose of enjoining those defendants from permitting the deposit of materials in Lake Wisconsin and on adjacent roads . . . ." *Deetz*, 66 Wis. 2d at 5, 224 N.W.2d at 409. The court applied the reasonable use doctrine to those deposits. *Id.* at 5-8, 18, 224 N.W.2d at 409-11, 416.

Shanaks contend that the reasonable use doctrine does not apply when surface water is conveyed in an artificial structure such as a storm sewer, citing *Mueller Real Estate & Inv. Co. v. Cohen*, 158 Wis. 461, 465, 149 N.W. 154, 155 (1914). The *Mueller* court held that a landowner was entitled to damages for injury to his dwelling caused by the discharge of rain water col-

lected and discharged through a pipe on adjoining land. However, the supreme court held in *Tiedeman v. Village of Middleton*, 25 Wis. 2d 443, 449, 130 N.W.2d 783, 786 (1964) (footnotes omitted): "Municipal corporations have the same rights in regard to surface waters as have individuals. A municipality may, therefore, channel surface water in its natural direction via conduits rather than over the surface . . . if no new watershed is tapped and the volume of water is not increased." The common enemy doctrine was the law when *Tiedeman* was decided, but the ruling in that case that surface water law applies to surface water conveyed in a conduit has not been overruled. Therefore the reasonable use doctrine applies to surface water conveyed in a storm sewer.

J. Reasonableness of City's Use of Storm Sewer Outlets

The trial court concluded on the basis of the reasonable use doctrine that the City had no liability for the deposit of materials through its storm sewer system into the millpond and therefore Shanaks were not entitled to an injunction against the City's making further deposits into the pond. The court weighed the gravity of the harm from the storm sewer discharges against the harm that would be caused if the City lacked a storm sewer system. It found that substantially greater harm would be caused if the City had no storm sewers, since increased erosion and great public inconvenience would result. The court found that whatever harm may be caused by the deposit of materials carried with the water in the storm sewer system into the millpond, a greater good results from the system. The court concluded that the evidence failed to show that the pond would fill in within the next twenty

to forty years as a result of the storm sewer system. The court added that an injunction requiring the City to stop depositing sediment into the pond would require the expenditure of hundreds of thousands of dollars. It noted that Shanaks had failed to show irreparable injury and lack of an adequate remedy at law. The court determined that the equities do not favor an injunction. It concluded that the City should not be required to incur large expenditures to protect a hydroelectric facility engaging one full-time employee and producing an average of $1,968 per year in operating income from 1981 through 1989.

Briefly, RESTATEMENT (SECOND) OF TORTS § 822(a) provides that one is subject to liability for a private nuisance if, among other things, the invasion of another's interest in the use of land is intentional and unreasonable. A private nuisance is a nonpossessory invasion of another's interest in the private use and enjoyment of land. *Id.* at § 821D. An intentional invasion is unreasonable if (a) the gravity of the harm outweighs the utility of the actor's conduct or (b) the harm caused by the conduct is serious[8] and the financial burden of compensating for the harm would not render it unfeasible to continue the conduct. *Id.* at § 826. The factors considered in determining the gravity of the harm are listed in RESTATEMENT (SECOND) OF TORTS § 827, and § 828 lists the factors considered in determining the utility of the conduct.

---

[8] The *Deetz* court used the RESTATEMENT (SECOND) OF TORTS (Tentative Draft No. 18, 1972), in its analysis. At that time § 826(b) provided that an intentional harm would be unreasonable if "the harm caused by the conduct is *substantial* . . . ." (Emphasis added.) In the RESTATEMENT (SECOND) OF TORTS § 826 (b) (1977), the word "substantial" is replaced by the word "serious."

The reasonableness of an intentional act is a question of fact to be determined by weighing the factors set out in § 826. *Deetz*, 66 Wis. 2d at 17, 224 N.W.2d at 415. The trial court applied the Restatement rules to the underlying facts and concluded that the City's conduct was reasonable. We therefore accept its conclusion.

K. Statutory and Constitutional Grounds for Relief

Shanaks propose that we avoid the effect of the reasonable use doctrine. They contend that the court should have provided them with injunctive relief under § 844.01, STATS., and Article I, Section 9 of the Wisconsin Constitution, from the City's depositing materials in their millpond. We disagree.

1. Statutory Grounds for Relief

Shanaks contend that § 844.01, STATS., grants to any person claiming an interest in real property a basis for injunctive relief abating an interference with property rights of that person, and, as applied to them, justifies an injunction against further intrusions. We disagree. Whether § 844.01 creates substantive rights is an issue of first impression. The supreme court noted in *Prah v. Maretti*, 108 Wis. 2d 223, 229 n.3, 242-43, 321 N.W.2d 182, 186, 192 (1982), that § 844.01 had never before been interpreted and applied, but ultimately found it unnecessary to decide whether that appellant stated a claim under § 844.01.

Section 844.01, STATS., provides:

(1) Any person owning or claiming an interest in real property may bring an action claiming physical injury to, or interference with, the property or his interest therein; the action may be to redress past injury, to restrain future injury, to abate the source of injury, or for other appropriate relief.

(2) Physical injury includes unprivileged intrusions and encroachments; the injury may be surface, subsurface or suprasurface; the injury may arise from activities on the plaintiff's property, or from activities outside the plaintiff's property which affect plaintiff's property.

(3) Interference with an interest is any activity other than physical injury which lessens the possibility of use or enjoyment of the interest.

(4) The lessening of a security interest without physical injury is not actionable unless such lessening constitutes waste.

Section 844.01(1), STATS., creates no rights or duties. It does not purport to create a cause of action. It is a remedial and procedural statute.

The history of § 844.01, STATS., establishes its remedial nature. Section 844.01 was originally enacted as § 814.01, STATS. Laws of 1973, ch. 189, § 16.[9] The source of Chapter 189 was 1973 S.B. 116. An analysis of S.B. 116 by the Legislative Reference Bureau stated that "it is a recodification of the law on real property" and it sets out "interests in real property, real property remedies obtainable by a lawsuit and the legal procedure to be used to obtain the remedies." The source of

___

[9] Section 814.01, STATS., 1975-76, was renumbered § 844.01, STATS. SUPREME COURT ORDER, 67 Wis. 2d 767-68, 63 (1976).

S.B. 116 was 1971 A.B. 316. The prefatory note to A.B. 316 states that it "is one of a series—the others were enacted in the 1969 Session—prepared by the State Bar of Wisconsin in response to a request made by the 1967 legislature through SJR 49, which was adopted."

Senate Joint Resolution 49 related to legislation the State Bar of Wisconsin had suggested "on remedies in the field of real property." 1967 S.J.R. 49. It states that the statutes relating to "remedies involving real estate have not been codified or revised and through piecemeal amendment have been made increasingly more complicated," and that "there is a need to simplify and standardize court procedure for enforcing remedies" available to persons having an interest in real estate. It requests the State Bar of Wisconsin to prepare bills for submission to the 1969 legislature "containing its recommendations for revision and simplification of the law relating to remedies in the field of real property." The resolution does not request the creation of new or the revision of old rights or duties.[10]

---

[10] Appropriate legislation was introduced. Announcements in the Wisconsin Bar Bulletin confirm the remedial nature of the 1973 legislation. *See Real Property Remedies to be Studied*, WIS. BAR BULL., June 1967, at 54 (State Bar research project under way "relating to real property remedies and procedure"); *Report of Real Property, Probate, and Trust Section*, WIS. BAR BULL., June 1968, at 48 ("work being done on proposals to amend the statutes on real estate remedies"); *Real Property Remedies Law Revised*, WIS. BAR BULL., June 1974, at 17 (describing Laws of 1973, ch. 189, as completing "a revision of real property remedies").

Section 844.01, STATS., does not support Shanaks' claim that they are entitled to an injunction against future deposit of materials in the millpond.[11]

## 2. Article I, Section 9, Wisconsin Constitution

Article I, Section 9 of the Wisconsin Constitution provides that:

> Every person is entitled to a certain remedy in the laws for all injuries, or wrongs which he may receive in his person, property, or character; he ought to obtain justice freely, and without being obliged to purchase it, completely and without denial, promptly and without delay, conformably to the laws.

Although often cited by parties casting about for a cause of action, Article I, Section 9, does not confer a legal right or claim on a plaintiff. It merely guarantees to every litigant a day in court, *Metzger v. Wisconsin Dept. of Taxation*, 35 Wis. 2d 119, 129, 150 N.W.2d 431, 436 (1967); *Neuhaus v. Clark County*, 14 Wis. 2d 222, 229, 111 N.W.2d 180, 184 (1961), and not a legal right or cause of action. *Messner v. Briggs & Stratton Corp.*, 120 Wis. 2d 127, 133, 353 N.W.2d 363, 366 (Ct. App. 1984); *Oliver v. Travelers Ins. Co.*, 103 Wis. 2d 644, 650, 309 N.W.2d 383, 386 (Ct. App. 1981). Conse-

[11] Laws of 1973, ch. 189, consists of twenty-one sections, only one of which creates a substantial right. Laws of 1973, ch. 189, § 16. That section created § 814.10, STATS., 1975-76, which provides in substance that a hedge or other structure in the nature of a fence unnecessarily exceeding six feet in height maliciously erected or maintained to annoy the owners or occupants of adjoining property, is enjoinable as a private nuisance.

quently, Article I, Section 9, does not provide Shanaks with a right to injunctive relief against the City.

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded for further proceedings consistent with this opinion; Shanaks to recover one-half of their costs from the City, no costs to the City.